**CITY OF OLMSTED FALLS, OHIO, Petitioner,**

**v.**

**FEDERAL AVIATION ADMINISTRATION and Department of Transportation, Respondents.**

City of Cleveland, Ohio, Intervenor.

No. 00–1548.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 2002.

Decided June 14, 2002.

Rehearing Denied Aug. 5, 2002.

Barbara E. Lichman argued the cause for petitioner. With her on the briefs was Berne C. Hart.

Martin D. Gelfand, Staff Counsel, U.S. House of Representatives, was on the brief for amicus curiae U.S. Representative Dennis J. Kucinich in support of petitioner.

Lisa E. Jones, Attorney, U.S. Department of Justice, argued the cause for re-spondents. With her on the brief were John C. Cruden, Assistant Attorney General, James C. Kilbourne, and Andrew C. Mergen, Attorneys.

Michael M. Conway argued the cause for intervenor City of Cleveland, Ohio. With him on the brief was Michael Schneiderman.

Alan B. Daughtry and Sharon M. Mattox were on the brief for amicus curiae Continental Airlines Corporation, Inc. in support of respondent.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The City of Olmsted Falls, Ohio, petitions this Court for review of the Federal Aviation Administration's ("FAA") approval of the Record of Decision for a runway improvement project at Cleveland Hopkins International Airport. *See* Notice of Approval of the Record of Decision for Proposed Development at the Cleveland Hopkins International Airport, Cleveland, Ohio, 65 Fed. Reg. 70374–75 (Nov. 22, 2000). The runway improvement project includes the relocation of one existing runway, the shift and extension of the other parallel runway, and other attendant projects. Olmsted Falls contends that the FAA's approval was arbitrary and capricious, in violation of: Clean Air Act Section 176(c), 42 U.S.C. § 7506(c); the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"); and Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) ("DOT Act"). Olmsted Falls also argues that a supplemental environmental impact statement is required under NEPA. Because the FAA's approval of the Record of Decision was neither

arbitrary nor capricious, and because no further documentation is required under NEPA, we deny the petition for review.

## I. Background

Cleveland Hopkins International Airport ("CLE" or "the airport") is owned by the City of Cleveland, Ohio, and operated by Cleveland's Department of Port Control. CLE is a major hub for Continental Airlines and as such serves as an important mid-country hub for the National Airspace System as defined by the FAA. The airport is currently served by three active runways: the two parallel runways, which run northeast/southwest, are separated by only 441 feet, and a third crosswind runway is primarily used by turboprop craft. Due to the extremely narrow separation between the two parallel runways, CLE currently uses one exclusively for arrivals and the other exclusively for departures, reducing capacity and increasing airfield complexity. Studies conducted by the Cleveland Department of Port Control and the FAA indicated that the current runway configuration at CLE is inadequate and modernization is required to alleviate safety risks and to meet future regional and national air travel needs. These studies indicated that by 2003 the existing airport runway system would operate at levels of delay in excess of 12 minutes per aircraft during peak periods.

In 1999, the Cleveland Department of Port Control began preparing a Master Plan Update, a study used to develop and evaluate facilities recommendations consistent with the airport's character and activity levels. Specifically, the Department of Port Control sought to develop solutions for CLE that would enhance safety, improve efficiency, and lessen the environmental impacts of the airport. After evaluating various airfield and air traffic alternatives, the Department of Port Control issued its Airport Layout Plan. The Airport Layout Plan proposed updating both runways to ensure they meet current FAA design standards and to generally enhance safety, while providing for anticipated demand. The Plan recommended relocating and replacing one of the parallel runways 1241 feet away from the other. The remaining original runway would be shifted 960 feet southwest and extended 2250 feet. This would create greater spacing between the two runways and thus accommodate two parallel taxiways between the runways.

While the Master Plan Update was being prepared by the Department of Port Control, the FAA began the public phase of the environmental review process in May 1998. In October 1999, the FAA issued the draft environmental impact statement ("EIS") for the implementation of the Master Plan Update and the Airport Layout Plan projects. These projects were the preferred alternative in the draft EIS, and were the subject of written comments by the City of Olmsted Falls ("the City" or "Olmsted Falls"). Following public comment, the FAA released the final EIS in June 2000, and issued the Record of Decision on November 8, 2000. The Record of Decision contains the rationale for all required findings and provides approval for certain projects included in the Department of Port Control's Airport Layout Plan.

Olmsted Falls filed this petition for review of the Record of Decision on December 29, 2000, pursuant to 49 U.S.C. § 46110(a). Subsequently this Court denied Olmsted Falls' motion to stay and motion to expedite.

## II. Analysis

### A. Standing

■ Before reaching the merits of Olmsted Falls' petition, we must determine

whether the City has standing before this Court. To satisfy the constitutional requirement of standing, a plaintiff or petitioner must, at an "irreducible. constitutional minimum ... demonstrate that it has suffered a concrete and particularized injury that is: (1) actual or imminent, (2) caused by or fairly traceable to, an act that the litigant challenges in the instant litigation, and (3) redressable by the court." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (en banc) (internal quotation marks and citations omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The federal respondents[1] contend that the City failed "clearly to allege facts" sufficient to demonstrate standing. *SunCom Mobile & Data, Inc. v. FCC*, 87 F.3d 1386, 1387–88 (D.C.Cir.1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth*, 422 U.S. at 518, 95 S.Ct. at 2215. According to the FAA, Olmsted Falls failed, in its petition and opening brief, to submit any affidavits or present any factual evidence at all showing that it had suffered an injury specific to itself.

 In response, the City first contends that it has the necessary "geographic nexus" required to bring an action under "an environmental statute," in that it is located two miles to the southwest of CLE. However, geographic proximity does not, in and of itself, confer standing on any entity under NEPA or any other statute. Rather, it is the concrete and particularized injury which has occurred or is imminent *due to* geographic proximity to the action challenged that gives rise to Article III standing. *See, e.g., Lujan*, 504 U.S. at 572–73 & n. 7, 112 S.Ct. at 2142–43 & n. 7; *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1283 (1st Cir.1996). Moreover, as a matter of prudential standing, "we have squarely held that a NEPA claim may not be raised by a party with no claimed or apparent environmental interest. It cannot be used as a handy stick by a party with no interest in protecting against an environmental injury to attack a defendant." *Town of Stratford, CT v. FAA*, 285 F.3d 84, 88 (D.C.Cir.2002) (citation omitted). Thus, Olmsted Falls must allege an *injury* related to an environmental interest—geographic proximity might be necessary to show such an injury, but it is not sufficient.

 The City further claims that it may represent its citizens, much as a private association could represent its members' interests. According to the City, "it may properly be inferred that its citizens will use the water from the same watershed into which Abram Creek flows and will breathe the air containing the increased construction and aircraft emissions from the Project undispersed by any significant distance from its points of emission." The City's analogy of its representation of its citizens to a private organization's representation of its members misconceives the very concept of associational standing. "An association only has standing to bring suit on behalf of its *members* when its *members* would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation

---

1. Federal respondents include the Department of Transportation, DOT Secretary Mineta, the FAA, FAA Administrator Garvey, and FAA Regional Administrator Hunzinger. For convenience we refer to them hereinafter as "the FAA."

of individual members in the lawsuit." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C.Cir.2002) (emphasis added); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The City does not have "members" who have voluntarily associated, nor are the interests it seeks to assert here germane to its *purpose*. Rather the City is effectively attempting to assert the alleged interests of its citizens under the doctrine of *parens patriae*. Arguably, this theory of standing is unavailable because a state may not sue the federal government on behalf of its citizens as *parens patriae*. *E.g. Kansas v. United States*, 16 F.3d 436, 439 (D.C.Cir.1994); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Although "the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*." *Massachusetts v. Mellon*, 262 U.S. 447, 485–86, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (internal citation omitted). As municipalities derive their existence from the state and function as political subdivisions of the state, presumably they too cannot sue the federal government under the doctrine of *parens patriae*.

■ We need not, however, decide that question. In this Circuit we have found standing for a city suing an arm of the federal government when a harm *to the city itself* has been alleged. *E.g. City of Lafayette, La. v. SEC*, 481 F.2d 1101, 1103 n. 3 (D.C.Cir.1973) ("The Cities satisfy the standing requirement by alleging injury in fact and a non-frivolous claim that the 1935 Act requires consideration of the Cities'

contentions in an acquisition proceeding."); *City of Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 484–85 (D.C.Cir.1990), *overruled in part, Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C.Cir.1996) ("The polities' claim to standing rests upon an entirely different footing. They assert that the CAFÉ standard of 26.0 mpg for MYs 87–88 adversely affects air quality in their urban areas, making it more difficult for them to comply, as they must, with the air quality standards imposed upon them by the Clean Air Act."). Thus, Olmsted Falls may bring this petition if it alleges harm to itself as city *qua* city. Taking a generous reading of the petitioner's materials, we find that Olmsted Falls has alleged harm to its own economic interests based on the environmental impacts of the approved project. Although it is a close question, we conclude that the City has standing to bring this action.

### B. FAA Approval of the Record of Decision

Olmsted Falls raises four principal objections to the FAA's approval of the Record of Decision for the runway improvement projects at CLE. First, the City contends that the FAA has violated the conformity provisions of the Clean Air Act, Section 176(c), 42 U.S.C. § 7506(c), by omitting analysis of nitrogen oxides (NOx) from at least 21 undisclosed construction projects and improperly determining that emissions from the CLE improvement Plan will not exceed the 100 tons NOx per year *de minimis* threshold established by the Environmental Protection Agency ("EPA"). *See* 40 C.F.R. § 93.153. Second, arguing that the FAA failed to consider adequately the water quality impacts of the CLE improvement Plan, Olmsted Falls challenges the FAA's failure to disclose (alleged) non-compliance with the Clean Water Act as a violation of NEPA. Third,

the City insists that the alleged degradation of Abram Creek, caused by a culverting of a portion of the creek to build the relocated runway, constitutes a "use" of parkland requiring "full analysis" under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c). Finally, Olmsted Falls believes that these alleged errors require a remand for the FAA to perform a supplemental EIS pursuant to NEPA.

 These challenges are reviewed under the Administrative Procedure Act's ("APA") arbitrary and capricious standard. This standard is applied to review compliance with NEPA and to determine the adequacy of an EIS, *see Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), as well as to review of determinations required by the Clean Air Act. *See Ethyl Corp. v. EPA,* 51 F.3d 1053, 1064 (D.C.Cir.1995) (standard for judicial review under Clean Air Act taken directly from Administrative Procedure Act). Under NEPA, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Courts review the EIS to "ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." *City of Grapevine, Tex. v. DOT,* 17 F.3d 1502, 1503–04 (D.C.Cir.1994) (upholding FAA approval of an airport plan).

 Notwithstanding the City's assertion to the contrary, the FAA's conformity analysis under 42 U.S.C. § 7506(c) is evaluated under the arbitrary and capricious standard set forth in the APA. *See, e.g., Conservation Law Foundation, Inc. v. Busey,* 79 F.3d 1250, 1260–63 (1st Cir.

1996). Section 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c), charges the heads of "department[s], agenc[ies], or instrumentalit[ies] of the Federal Government" with "assur[ing] ... conformity." Indeed, the implementing regulations specify that "[a]ny Federal department, agency, or instrumentality of the Federal government taking an action subject to this subpart must make *its own* conformity determination consistent with the requirements of this subpart" and that, if it wishes to, "[w]here multiple Federal agencies have jurisdiction for various aspects of a project, a Federal agency *may* choose to adopt the analysis of another Federal agency ... in order to make its conformity determination." 40 C.F.R. § 93.154 (emphasis added). Thus in reviewing a challenge to such a determination, we apply the same standard we would to any other final agency action—the arbitrary and capricious standard set forth in the APA. *See Busey,* 79 F.3d at 1260–61. Petitioner contends that since the Clean Air Act does not vest responsibility for implementation of the Clean Air Act with the FAA and the "FAA's sole area of statutorily mandated responsibility under the Clean Air Act is consultation with the [U.S. Environmental Protection Agency] in the establishment and enforcement of aircraft engine emission standards," the FAA is not entitled to deference. The City seems to be conflating arbitrary and capricious review with *Chevron* deference. Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we defer to administrative agencies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27,

121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). It is because of this *delegation,* express or implied, that we give deference to an agency's statutory interpretation. Thus, when we are faced with an agency's interpretation of a statute *not* committed to its administration, we give no deference. *E.g. Ass'n of Civilian Technicians v. FLRA,* 269 F.3d 1112, 1115–16 (D.C.Cir.2001). Here, however, the FAA has not purported to *interpret* the conformity provisions of the Clean Air Act, but rather only to apply them.

Finally, where the FAA is forecasting capacity and "predicting demand at an airport, the agency's conclusion is due 'more deference.'" *City of Los Angeles v. FAA,* 138 F.3d 806, 807 n. 2 (9th Cir.1998). That such determinations are integral to, indeed, inseparable from, the overall conformity analysis here further confirms that the arbitrary and capricious standard of review applies. With this standard of review in mind, we consider, and reject, each challenge in turn.

### 1. Clean Air Act

Petitioner argues that the FAA failed to adequately disclose and analyze various air quality impacts of the proposed CLE project, in violation of the Clean Air Act. First, it suggests that there are 21 construction-related projects which the FAA omitted from the air quality analysis in the EIS and Record of Decision, including the NOx emissions arising from 6880 days of unreported construction equipment operation. According to Olmsted Falls, these omissions show an additional 5.76 tons of NOx per year could be generated in 2001, 7.57 tons per year possibly in 2002, and 4.84 tons per year potentially in 2003, which would exceed the *de minimis* threshold of 100 tons NOx per year, and thus violate the Clean Air Act's conformity provisions. 40 C.F.R. § 93.153; 42 U.S.C.

§ 7506(c). Because even a small use of various pieces of construction equipment *could* breach the *de minimis* threshold, the petitioner contends "there remains an open question as to whether Project emissions will exceed the 100 ton per year NOx *de minimis* threshold in at least 2001–2003."

Second, petitioner also contends that the FAA acted arbitrarily and capriciously in determining the baseline for emissions if the CLE redevelopment is not pursued. In essence, Olmsted Falls claims that the FAA overestimated the "natural" growth that would occur without improvements and failed to substantiate its claim that the existing airfield capacity could accommodate this supposed "natural" growth. Because the CLE redevelopment could attract additional air traffic, it is the City's position that the FAA underestimated the increase in NOx emissions due to the increased capacity arising from the redevelopment project.

Finally, Olmsted Falls asserts that the *de minimis* exception does not apply to "airport expansions" because in promulgating its final rule implementing the Clean Air Act's conformity provisions, the EPA stated that "[l]arger projects, *such as an airport expansion* ... would require a conformity review under all of these *de minimis* levels." Determining Conformity of General Federal Actions to State or Federal Implementation Plans, 58 Fed. Reg. 63214, 63228 (Nov. 30, 1993) (emphasis added). As a consequence, it is Olmsted Falls' position that we must remand and require the FAA to perform a full conformity analysis and supplemental EIS.

In response, the FAA contends that it "complied with CAA requirements, conformed to relevant regulations, and followed FAA's own guidance documents," in analyzing construction emissions and "reasonably determined that emissions for the

project, including construction emissions for the project, will not at any time during the construction or implementation of the project, meet or exceed the thresholds established" in the Clean Air Act, and were, therefore, *de minimis*. According to the FAA, the record provides no basis on which to second guess the combined expertise of the FAA and the agencies which reviewed its determinations (the EPA, Ohio EPA, and the Metropolitan Planning Organization). Further, it is the FAA's position that petitioner has waived this Clean Air Act claim by failing to challenge the FAA's methodology during the administrative proceedings and never previously arguing that the construction emissions analysis failed to account for these alleged 21 construction projects. *See* 49 U.S.C. § 46110(d); *Northwest Airlines, Inc. v. DOT*, 15 F.3d 1112, 1120–21 (D.C.Cir. 1994). Even if this claim is not waived, the FAA argues that all elements of the construction required for, and related to, the CLE runway improvement project were disclosed in the final EIS and analyzed as part of FAA's air quality analysis. The FAA also contends that it relied on an appropriate baseline in its calculation of natural growth and that this determination is due substantial deference.

 In determining whether Olmsted Falls is barred from using these 21 projects to challenge the FAA's conformity analysis, we must consider whether the FAA had adequately disclosed the 21 projects. It appears that it did. Both the draft EIS and the final EIS disclose all of the projects approved in the Record of Decision, though not all of the activities approved include construction activity. The FAA grouped all of the projects into four major construction activities and estimated NOx emissions from each activity. Both the draft EIS and the final EIS identified various "independent utility pro-

jects" and explained that these projects were "not dependent or interdependent upon the approval of the federal actions" which were the subject of the EIS and would be "completed regardless of the approval and progress of the airport development proposed" in the EIS. Thus these projects were "included within the Baseline (No–Action/No–Build) Alternative as well as within each development alternative." Yet, at no point after the draft EIS or the final EIS did Olmsted Falls raise claims before the FAA involving these 21 construction projects. Moreover, Olmsted Falls could have requested data and calculations supporting the FAA's conformity determination under 40 C.F.R. § 93.156, but failed to do so until one day before the Record of Decision was signed. We agree with the FAA that Olmsted Falls, by not challenging the alleged non-inclusion of these 21 projects before the FAA, waived this claim under the Clean Air Act.

 Even were we to find that these 21 projects were not adequately disclosed by the FAA, we would conclude that Olmsted Falls has failed to carry its burden of proof of showing that this non-disclosure undermined the FAA's determination. " '[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.' " *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C.Cir.2000) (quoting *San Luis Obispo Mothers For Peace v. United States Nuclear Regulatory Comm'n*, 789 F.2d 26, 37 (D.C.Cir.1986) (en banc)). Indeed, "[e]ven assuming [the FAA] made missteps ... the burden is on petitioners to demonstrate that [the FAA's] ultimate conclusions are unreasonable." *National Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1146 (D.C.Cir.2002). Here petitioner concedes that the emissions from these 21 projects *might* undermine the FAA's *de minimis* determination, *not*

that they necessarily will. Thus Olmsted Falls has failed to show that the FAA's "overall determination" is unreasonable. *Id.* As the FAA explains, some of the projects petitioner describes were considered as sub-elements within the major construction categories. Some independent utility projects were subject to separate NEPA analyses and included as part of the baseline for the project because they were not dependent or interdependent upon the approval of the federal actions requested in the EIS. Finally, some of these projects were routine maintenance that are the kind that would be conducted with or without FAA review or federal approval or funding, and thus were excluded. Moreover, the FAA explains that in calculating emissions from construction, it conservatively estimated a 10–hour workday and an average work month of 20 days—without considering likely work stoppage for inclement weather. Based on this conservative approach, the operational hours for the replacement runway construction included over 2000 additional hours as compared to similar projects at other airports. In short, we cannot say that the FAA's determination was arbitrary and capricious.

 Nor is the FAA's determination of the baseline for natural growth at CLE, and thus the baseline for NOx emissions, arbitrary and capricious. The FAA determined that the airport can accommodate the predicted demand for 2006, based on its current airfield configuration and without the proposed improvements. While there may be delays, FAA defines capacity without reference to delay goals. Here the improvements are to move an *existing* runway, not the addition of a runway, and thus in the FAA's judgment they will not induce demand. According to the FAA, its forecasts show that "the demand for air travel at CLE is independent of the proposed improvements at the Airport." In other words, "if you don't build it, they will come anyway." *City of Los Angeles v. FAA,* 138 F.3d 806, 807 (9th Cir.1998); *see also National Parks & Conservation Ass'n v. DOT,* 222 F.3d 677, 680 (9th Cir.2000). The FAA's expertise in forecasting air transportation demand and airfield capacity are areas where courts accord significant deference. *See National Parks,* 222 F.3d at 682; *City of Los Angeles,* 138 F.3d at 807 n. 2. As the FAA is entitled to rely upon its demand and capacity forecasts, and to credit the views of its own experts—who are charged with determining demand and capacity issues for the National Airspace System—over Olmsted Falls' contrary views, we cannot say that the FAA's determination was unreasonable. *See City of Bridgeton v. FAA,* 212 F.3d 448, 459 (8th Cir.2000); *Custer County Action Assoc. v. Garvey,* 256 F.3d 1024, 1036 (10th Cir.2001). In sum, petitioner has failed to carry its burden to demonstrate that the FAA's ultimate conclusion that the *de minimis* exception applied was unreasonable.

 As for the applicability of the *de minimis* exception, we find nothing in the EPA's rule implementing conformity provisions that prohibits the FAA from applying such an exception. 40 C.F.R. § 93.153. The EPA's language is merely illustrative, simply acknowledging that "[l]arger projects" would generally exceed the *de minimis* limitations, and airport expansions *tend to be* larger projects. 58 Fed. Reg. at 63228. Of course, this project is not an airport *expansion,* but rather a relocation of an existing runway. In any event, this language does not appear in the EPA's rule, only in the accompanying commentary. *See id.;* 40 C.F.R. § 93.153. Because the FAA's finding that the NOx emissions resulting from the proposed CLE redevelopment fall within the *de*

*minimis* threshold is not unreasonable, we reject petitioner's Clean Air Act claims.

## 2. NEPA

The City contends that the FAA "failed to disclose that the [airport redevelopment] Project would not meet State or Federal water quality standards even though it knew that to be the case," claiming that the evidence before the FAA "conclusively demonstrates that ´ water quality would be permanently and adversely affected by the development of the Project." According to Olmsted Falls these assertions are not a collateral attack on the decisions of state environmental authorities allowing the redevelopment of the airport to go forward, but merely demonstrate that by failing to disclose this (alleged) non-compliance with the Clean Water Act, the FAA has failed to comply with NEPA. The City then explains that a Clean Water Act Section 401 permit, 33 U.S.C § 1341, was not obtained from the local authorities, rather they only granted a waiver, which Olmsted Falls contends they have no power to do under state law. According to the City, although federal law gives the Army Corps of Engineers the power to accept a waiver, 33 C.F.R. 325.2(b)(ii); 40 C.F.R. 121.16(a), it is only "where State law allows such a waiver" and "such power does not exist under Ohio law." *See* Ohio Rev.Code § 6111.03P; Ohio Admin.Code § 3745–32–07. The absence of a valid section 401 permit or waiver is alleged to undermine the section 404 permit issued by the Corps of Engineers. 33 U.S.C. § 1344.

■■■■ Respondents contend that this is essentially a collateral attack on the state environmental Director's decision to grant a waiver: "To the extent Olmsted disagrees with OEPA's decision, arguments attacking this decision have no place here." We agree. Although the petitioner may disagree with the substantive decisions made by the various agencies involved in an EIS, neither NEPA nor any other statute confers jurisdiction on this Court to hear such challenges as part of this proceeding. *See* 42 U.S.C. § 4332; 49 U.S.C. § 46110. When reviewing an environmental impact statement, it does not matter whether we agree with the agency's conclusions. Rather, the EIS acts as a *procedural* safeguard. *See, e.g., City of Los Angeles*, 138 F.3d at 807. As for the section 401 permits, it was not arbitrary or capricious for the FAA to rely on the determination of the local authorities. Unlike the respondents in *Natural Resources Defense Council v. Daley*, 209 F.3d 747 (D.C.Cir.2000), which turned on an agency's assumption that states would voluntarily comply with a quota, here the FAA has not merely *assumed* that proper permits would be issued; rather, it was clear that receipt of requisite permits was a *condition* of approval. This is not a proper forum for Olmsted Falls to assail the Ohio EPA's decision to grant a waiver. Indeed, at oral argument, petitioner conceded it was pursuing litigation in a local forum. Further, any challenge to a section 404 permit should be brought in district court under the Clean Water Act in the first instance. There is no basis in the petitioner's NEPA-based allegations upon which we can grant relief.

## 3. Department of Transportation Act Section 4(f)

■■■■ Petitioner contends that the FAA inadequately analyzed alternatives under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), because if it had "it would have ascertained that the anticipated degradation of Abram Creek indeed constitutes a use of parkland and public waters that warrants the full analysis mandated by § 4(f)." "The 'use'

of parklands within the meaning of section 4(f) includes not only actual, physical takings of such lands but also significant adverse indirect impacts as well." *Allison v. DOT,* 908 F.2d 1024, 1028 (D.C.Cir.1990). The City alleges that the "massive filling" and culverting of Abram Creek would seriously damage the creek's "use as a ... habitat," its "aesthetic value," and also "crush its wildlife." Olmsted Falls contends that the FAA declined to engage in the exploration of more prudent and reasonable alternatives, or the development of a plan that would minimize the (alleged) harm. *See* 49 U.S.C. § 303(c). The City contends that the FAA violated section 4(f) because it failed to consider options to determine what would cause the least harm. However, respondents contend that the petitioner's section 4(f) arguments are jurisdictionally barred as the City failed to raise them below.

We are, of course, barred by statute from considering this argument if, as the FAA argues, petitioner failed to articulate it before the agency. 49 U.S.C. § 46110(d) ("court may consider an objection to an order of the ... Administrator only if the objection was made in the proceeding conducted by the ... Administrator or if there was a reasonable ground for not making the objection in the proceeding"); *see also Northwest Airlines,* 15 F.3d at 1120–21; *Horizon Air Indus., Inc. v. DOT,* 850 F.2d 775, 780 (D.C.Cir.1988); *Continental Air Lines, Inc. v. DOT,* 843 F.2d 1444, 1455 (D.C.Cir.1988). There is no evidence that Olmsted Falls raised this issue before the FAA. Indeed, the City failed to respond to the FAA's allegation of waiver in its reply brief. Therefore we dismiss this claim as jurisdictionally barred.

### 4. Supplemental EIS

Petitioner contends that the claims it makes demonstrate that there are "signifi-cant new circumstances or information relevant to environmental concerns" that require a supplemental EIS. 40 C.F.R. § 1502.9(c)(1)(ii). The undisclosed construction projects allegedly provide a basis for a supplemental EIS, as does the status of the water quality analyses. The City argues that these "new circumstances" are especially significant where, as here, they go directly to non-compliance with the purpose and substantive requirements of the Clean Air Act and the Clean Water Act.

As respondents point out, much of what Olmsted Falls dubs "new" is not. It was all known to the FAA prior to the issuance of the Record of Decision. A supplemental EIS is only required where new information "provides a *seriously* different picture of the environmental landscape." *E.g. Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir.1984) (emphasis in original). Given our rejection of the City's other claims, there simply is not significant new information, and the landscape is unchanged. The decision to undertake a supplemental EIS is subject to a "rule of reason." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Petitioner must show that it was arbitrary and capricious for the respondents not to undertake a supplemental EIS. The City has failed to meet its burden.

### III. Conclusion

Reading its filings before this Court generously, we hold that the City of Olmsted Falls alleged sufficient harm to itself as a city to have standing. Reaching the merits, we reject each of the petitioner's claims. The FAA's determination that NOx emissions from the CLE airport redevelopment would be *de minimis* was not arbitrary and capricious. Olmsted Falls' NEPA claim is in essence a collateral at-

tack on the underlying substance of the local environmental authorities' determinations. As the FAA was entitled to rely on these determinations, the City's NEPA claim is without merit. The City's claim under the DOT Act is barred because it had not been raised previously. Given our findings, the FAA's decision not to undertake a supplemental EIS was not arbitrary and capricious. The petition for review is denied.