Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued April 19, 2004          Decided July 9, 2004

No. 03-1111

NATIONAL COMMITTEE FOR THE NEW RIVER, INC.
AND BARBARA G. SMITH, AN INDIVIDUAL,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

EAST TENNESSEE NATURAL GAS COMPANY,
INTERVENOR

————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

————

*James W. McNeely* argued the cause and filed the briefs for petitioners.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Cynthia A. Marlette*, General Counsel.

*Henry S. May, Jr.*, *John S. Decker*, *Catherine O'Harra* and *Paul M. Teague* were on the brief for intervenor.

Before: SENTELLE, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: At issue in this appeal are two orders of the Federal Energy Regulatory Commission approving the application of the East Tennessee Natural Gas Company ("East Tennessee") for a certificate of public convenience and necessity to construct a pipeline extension through southwest Virginia and North Carolina known as "the Patriot Project." The National Committee for the New River, Inc. and others (together "New River") contend that the Commission's environmental review of the Patriot Project was deficient in several respects: (1) the draft environmental statement was inadequate and incomplete in its disclosure and analysis of the environmental effect of the project; (2) neither the draft nor the final environmental impact statements adequately identified alternate routes for the pipeline; (3) the location of the underground taps should not have been considered in evaluating alternative routes for the pipeline, or if considered, their environmental impacts should have been considered; and (4) the draft environmental impact statement was deficient for failing to consider the impacts of two proposed generating plants.

We hold that the record demonstrates, consistent with the evolving nature of a major project, that the Commission's process for ventilating and analyzing potential environmental impacts of the Patriot Project involved the requisite "hard look," *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), and that any deficiencies in the draft environmental impact statement as may have existed were cured by the final environmental impact statement. Accordingly, because the Commission's approval of East Tennessee's application and the conditional issuance of a certificate of

public convenience and necessity to East Tennessee was not arbitrary and capricious or an abuse of discretion, we deny the petition.

## I.

On July 26, 2001, East Tennessee Natural Gas Company ("East Tennessee") filed an application for a certificate of public convenience and necessity under § 7(c) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(c), to expand an existing natural gas transportation pipeline in Tennessee and southwest Virginia, and to extend a new pipeline from Virginia to North Carolina ("the Patriot Project"). The purpose of the project was to help meet forecasted growth in natural gas consumption in Tennessee, Virginia, and North Carolina, to provide resources to meet the increased demand for natural gas-fired electric generation, and to stimulate industrial development in the region. The project would affect about 2,707 acres of land in three states, with a pipeline right-of-way 100 feet wide. It includes a 94 mile extension of East Tennessee's mainline transmission facilities from near Wytheville, Virginia to an intersection with facilities of the Transcontinental Gas Pipe Line Corporation in Eden, North Carolina, a seven mile extension to service a power plant in Henry County, Virginia, and associated mainline valves and other facilities, including underground taps.

On March 27, 2002, the Commission, following its policy of evaluating non-environmental aspects of a proposed project before the environmental ones, issued a *Preliminary Determination on Non–Environmental Issues*, finding that the public benefits of East Tennessee's proposal outweighed any adverse impacts. 98 FERC ¶ 61,331, 62,392 (2002). In making this determination, it weighed such factors as the proposal's market support and economic, operational, and competitive benefits. *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,743 (1999); *Order Clarifying Statement of Policy*, 90 FERC ¶ 61,128, 61,396 (2000); *Order Further Clarifying Statement of Policy*, 92 FERC ¶ 61,094, 61,373 (2000). On the benefits side, the

Commission found that the "Patriot Project is in the public interest because it will provide fuel for new electric generation plants, provide additional gas supplies to existing local distribution companies (LDCs), and bring natural gas service to portions of southwestern Virginia for the first time." *Preliminary Determination,* 98 FERC at 62,392. It also noted that there was ample market demand for the Project, with seven shippers already under contract for 87 percent of the Project's capacity. On the impacts side, the Commission expected many potential adverse effects "will be resolved or mitigated with appropriate conditions in [the] final order" and with provisions for compensating property owners for any damage to property or the taking of property necessary for the pipeline right-of-way. *Id.* at 62,402. The Commission reserved issuance of the certificate pending completion of its environmental review.

The Commission's process for evaluating the environmental impacts of the project involved six steps: a notice of intent to prepare an impact statement, a draft impact statement, public hearings, staff review and evaluation of comments, a final impact statement, and finally Commission consideration of the final statement. On October 1, 2001, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement and Request for Comments on Environmental Issues ("NOI"). The NOI described the project and included an overview map as well as a website where further information was available. It advised that public "scoping" meetings would be held to solicit and address public concerns, and that there would be a visit to the proposed route. The NOI was sent to approximately 2,460 individuals, organizations, and interested parties, including federal, state, county, and local agencies, elected officials, and property owners along the proposed route of the extended pipeline. Four public scoping meetings and two public working meetings in various cities along the proposed route were held, and several hundred comments and objections were received.

On April 25, 2002, a draft environmental impact statement ("DEIS") was issued, assessing the environmental impacts associated with the construction and operation of the pipeline.

After the time for comment on the DEIS was extended, five public comment meetings were held in Virginia and Tennessee and one in Washington, D.C. Following evaluation of the comments by Commission staff, a final environmental impact statement ("FEIS") was issued on September 23, 2002. The Commission determined that the Patriot Project would result in limited adverse environmental impacts, and that mitigation measures detailed in the FEIS would "appropriately and reasonably" reduce and compensate for them.

In the first order on review, the Commission on November 20, 2002, issued East Tennessee a final certificate of authorization, subject to 69 conditions to mitigate environmental impacts. *See Order Denying Rehearing, Authorizing Abandonment, and Issuing Certificate* ("*Initial Order*"), 101 FERC ¶ 61,188, 61,743 (2002). The Commission rejected New River's petition for reconsideration of the *Preliminary Determination*, where it had argued that current data failed to support the need for increased gas service in the region, and that the economic benefits of the project were overstated. As relevant here, the Commission addressed the process of its environmental analysis, and explained that it was approving the project and general route, but not the final route delineation, due to survey and environmental study gaps resulting from East Tennessee's inability in some areas to gain access to property, the numerous conditions to be satisfied, and the need to obtain approval by various state and federal agencies regarding various aspects of the project. *See Initial Order,* 101 FERC at 61,756. It also addressed subjects New River raises in this appeal, such as the consideration of taps and alternative routes, and stated that it was adopting certain recommendations from the Virginia Department of Environmental Quality as added conditions to the Order. *Id.* at 61,759.

In the second order on review, the Commission, on February 27, 2003, denied the petition for rehearing of the November 20, 2002 order brought by New River, the Blue Ridge Coalition, and other petitioners, and denied New River's separate request for a stay. *See Order on Rehearing and Denying Stay* ("*Rehearing Order*"), 102 FERC ¶ 61,225, 61,-

655 (2003). The Commission rejected the stay as making no attempt to address the criteria for granting a stay, and, offering largely the same reasons as in the *Initial Order*, addressed the need for the Patriot Project, the adequacy of notice of the underground taps in the NOI and DEIS, and various environmental issues. *See id.* at 61,657–64.

## II.

The court's review of New River's challenges to the Commission's approval of the Patriot Project is limited to determining whether the two orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See B&J Oil & Gas v. FERC,* 353 F.3d 71, 75 (D.C. Cir. 2004); *Pub. Utils. Comm'n v. FERC,* 254 F.3d 250, 253–54 (D.C. Cir. 2001). The court considers, in this regard, both "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *ExxonMobil Gas Marketing Co. v. FERC,* 297 F.3d 1071, 1083 (D.C. Cir. 2002) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The court cannot substitute its judgment for that of the Commission, *id.*, and it must uphold the Commission's factual findings if they are supported by substantial evidence. 15 U.S.C. § 717r(b); *Texaco Inc. v. FERC,* 148 F.3d 1091, 1095 (D.C. Cir. 1998).

The same standard applies to New River's challenge to the adequacy of the Commission's compliance with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(c), and to the court's determination of the adequacy of the Environmental Impact Statement ("EIS"). *See City of Olmsted Falls v. FAA,* 292 F.3d 261, 269 (D.C. Cir. 2002) (citing *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 376 (1989)). Under NEPA, the court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. v. NRDC,* 462 U.S. 87, 97–98 (1983). An environmental impact statement is reviewed to "ensure that the agency took

a 'hard look' at the environmental consequences of its decision to go forward with the project." *Olmsted Falls,* 292 F.3d at 269 (quoting *City of Grapevine, Tex. v. DOT,* 17 F.3d 1502, 1503–04 (D.C. Cir. 1994)). When an agency "is evaluating scientific data within its technical expertise," an "extreme degree of deference to the agency" is warranted. *B&J Oil & Gas,* 353 F.3d at 76 (quoting *City of Waukesha v. EPA,* 320 F.3d 228, 247 (D.C. Cir. 2003)).

## A.

New River's challenge to the Commission's orders begins with the contention that the DEIS was inadequate and incomplete in its analysis of the environmental effects of East Tennessee's proposal, and was improperly segmented and sequenced. In New River's view, the DEIS was also "so incomplete and inadequate in important areas as to preclude meaningful analysis or comment," Petitioners' Br. at 30, that it should have been revised and republished, pursuant to Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. § 1502.9(a).

The DEIS revealed that as of the time it was prepared, East Tennessee had not yet filed a site-specific crossing plan for the New River waterway with the Commission. It advised, however, that the New River would be crossed using the horizontal directional drill ("HDD") technique, and that the crossing would be approximately 420 feet wide. The Commission disclosed that East Tennessee had met with Park representatives in May and November 2001, and that the "HDD exit point would be in an area the park has planned for the new campground facilities." *Patriot Project Draft Environmental Impact Statement* ("*DEIS*"), FERC Docket No. CP01–415–000, at 3–99 (Apr. 25, 2002). Further, the Commission noted that the Park Manager had been "concerned about disruption of the park trail traffic, settling of the trail along the trench line, and the introduction of a new cut in the treeline," and that the Park had expressed concern about an existing water well close to the proposed HDD crossing. *Id.*

That the description in the DEIS was sufficient to provide "a springboard for public comment," *Robertson*, 490 U.S. at 349, would appear evident from the comments received by the Commission. New River, for instance, commented in an Issue Paper on August 19, 2002 that East Tennessee had failed to disclose that the proposed gas line route would pass directly through Park property and that there was a 30% probability that the HDD would fail. The Virginia Horse Council submitted a comment expressing concern that the exit hole and open trench area was a State Park equestrian campground, that the HDD crossing under the river might not turn out to be possible, that a gas-fired steam power plant would be located within a half mile of the state park, that tourism would suffer, and that there could be adverse biological impacts on the river both as a water source and as an aquatic habitat. The Blue Ridge Coalition, Roanoke River Basin Association, Appalachian Trail Conference, and the Environmental Protection Agency ("EPA"), among others, also submitted comments on the DEIS. The comments received by the Commission were sufficiently detailed and critical of particular deficiencies in the DEIS that the Commission was later able to address the deficiencies in the FEIS. The FEIS responded to some comments by explanation and for others, recommended conditions that had to be satisfied before the certificate could be "effectuated." *See Rehearing Order*, 102 FERC at 61,659. These conditions ranged from requiring HDD to cross the New River and the New River Trail State Park and an analysis of rerouting options in case of HDD failure, to requiring an approved site specific erosion and sediment control plan for the Park, all matters of concern to New River. *See Initial Order*, 101 FERC at 61,767–68.

Under the circumstances, we are by no means persuaded that the DEIS was deficient. As the Supreme Court stated in *Robertson*, 490 U.S. at 349,

> The statutory requirement that a federal agency contemplating a major action prepare . . . an environmental impact statement serves NEPA's "action-forcing" pur-

pose in two important respects. It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

(internal citations omitted). By its very name, the DEIS is a draft of the agency's proposed FEIS, and as such the purpose of a DEIS "is to elicit suggestions for change." *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1507 (D.C. Cir. 1994). New River has not shown that omissions in the DEIS left the public unable to make known its environmental concerns about the project's impact, even if the public was unable to analyze each aspect of the project, such as specific rather than generalized statements of proposed sitings. Indeed, as noted, comments on the DEIS resulted in substantial changes that were reflected in the FEIS and the orders on review. We leave open, however, the possibility that in cases of actual prejudice resulting from a deficiency in the DEIS, where, for example, omissions leave the agency without public comment on a material environmental aspect of a project and leave the relevant public without information about a proposed project, such deficiency may not be curable by the FEIS. But, the very matters of principal concern to New River on appeal are of a similar nature to those addressed by public comments on the DEIS and are reflected in the conditions attached by the Commission to the certificate of authorization for the project.

New River's other challenges to the sufficiency of the DEIS fare no better. Regarding New River's segmenting and sequencing contentions, the Supreme Court has offered relevant instruction, namely that NEPA does not require that a complete plan be actually formulated at the outset, but only that proper procedures be followed for ensuring that environmental consequences have been fairly evaluated. *See Robertson*, 490 U.S. at 352. The Commission explained that the practical realities of large projects, such as the Patriot Pro-

ject, involve considerable time and effort to develop, with segments of the project proceeding at different speeds. This is the result, for instance, of many individuals denying or limiting access to property that East Tennessee needs to survey and assess for environmental impacts. The Commission thus observed that "[i]f every aspect of the project were required to be finalized before any part of the project could move forward, it would be difficult, if not impossible, to construct the project." *Rehearing Order,* 102 FERC at 61,659.

Both the Supreme Court's instruction and the Commission's explanation provide an effective response to New River's contention that the DEIS was improperly segmented by failing to describe the project at sensitive environmental areas such as major river crossings, the National Forest lands, the New River Trail State Park, the Blue Ridge Parkway, and the Appalachian National Scenic Trail. In the DEIS, the Commission identified the areas where gaps existed, and in the FEIS, the Commission included conditions to address those gaps before construction and operation could proceed. *See Rehearing Order*, 102 FERC at 61,659; *Initial Order* Appendix, 101 FERC at 61,764–72. To the extent New River also contends that there was improper sequencing of the environmental analyses, some of which were submitted by East Tennessee in June 2002 after the public comment period had expired, New River points only to an Appendix to the June 17, 2002 Comments of East Tennessee on the DEIS, and never explains why this Appendix was so crucial that its absence denied the public of an opportunity meaningfully to comment on the environmental effects of the project. Undoubtedly, a nonsegmented project enables more comprehensive public notice to be provided in a DEIS. But the volume and substance of the comments received by the Commission in response to the DEIS undermine New River's position that the DEIS failed to serve its purpose. On appeal, New River has not pointed to any area it would have addressed differently had the Commission delayed issuance of the FEIS.

For essentially the same reasons, New River's contention that the DEIS should have been supplemented is unpersua-

sive. New River relies on CEQ regulations calling for a supplemental DEIS or FEIS if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1). However, in *Marsh v. Oregon Natural Resources Council*, 490 U.S. at 373, the Supreme Court explained that under the "rule of reason," "an agency need not supplement an [environmental impact statement ("EIS")] every time new information comes to light after the EIS is finalized." Instead, if the new information shows that the remaining action will affect the quality of the environment "in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* at 374. This court has similarly explained that a "supplemental EIS is only required where new information 'provides a *seriously* different picture of the environmental landscape.'" *Olmsted Falls*, 292 F.3d at 274. Under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A), the Commission's determination that the new information was not significant enough to warrant preparation of a supplement to the DEIS, is entitled to deference. *See Marsh*, 490 U.S. at 375–76.

The record indicates that on March 25, 2002, one month before the DEIS was issued, East Tennessee had provided the New River Trail State Park with a site-specific plan for crossing the river and the Park. This report was apparently not filed with the Commission until June 17, 2002, when East Tennessee commented on the DEIS, and supplemented its comments on June 18 with appendices that included a directional drill contingency plan and a further study of alternative routes. Because, as the issue is now framed by New River, the new information in East Tennessee's report did not cause the Commission to make "substantial changes in the proposed action," the question is whether the new information presented "significant new circumstances or information relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1).

East Tennessee's site-specific crossing report revealed that the "exit hole of the pipeline drill will coincide with a farm access road and cleared area that exists adjacent to the trail."

*East Tennessee Submission to New River Trail State Park,*
Exhibit B of Blue Ridge Coalition's June 16, 2002 Comments
on the DEIS, at 9 (Mar. 25, 2002). It also set out the
contingency plan, in case HDD technology were to fail, to use
standard construction techniques for crossing New River
Trail State Park land. In addition, the report identified
factors that could result in HDD failure: the large diameter
of the pipeline, and the difficulties in penetrating long lengths
of difficult subsurface conditions in the form of fractured
rock, gravel, or cobbles. Although the report provided new
information that is environmentally significant, the Commis-
sion could reasonably conclude that the information did not
significantly transform the nature of the environmental issues
raised in the DEIS and comments. The DEIS made clear
some of the attendant problems with East Tennessee's pro-
posed use of HDD to cross the river and trail, stating that the
exit point would be in an area of the park that had been
planned for new campground facilities, that there was concern
over the proximity of an existing water well, that the geology
was fractured dolomite (limestone), and that the aquifer was
not very deep in the area next to the river. The Commission
received comments on matters discussed in East Tennessee's
report in response to the DEIS. Hence, New River fails to
demonstrate that the information provided in the site-specific
crossing report seriously changed the environmental land-
scape. *See Olmsted Falls,* 292 F.3d at 274.

As noted, the Commission's process for evaluating the
environmental impact of East Tennessee's proposed project
was comprehensive, based on public comments that focused
the Commission's attention on the issues that New River now
contends were inadequately addressed in the DEIS. While
New River maintains that the exit hole and the possibility of
conventional drilling meant the environmental impact would
be different than could be understood from the DEIS, the
comments received alerted the Commission to these possibili-
ties, as for instance, the possible failure of HDD and disrup-
tion caused by open trench construction. The Commission
could reasonably conclude, then, in light of the comments,
that the DEIS had accomplished its purpose and that the new

information in the report had, in effect, already been anticipated by persons notified of East Tennessee's proposal. Furthermore, the FEIS responded to the new information, and included responsive proposed conditions, which were ultimately adopted by the Commission. Any defects there may have been in the DEIS were cured by the Commission's consideration of comments on the FEIS from such organizations as the Blue Ridge Coalition and the EPA. Moreover, in the *Initial Order* the Commission responded to the new information, in part, by conditionally issuing the certificate.

For these reasons, we conclude that the Commission was not arbitrary and capricious and did not abuse its discretion in determining that the DEIS had served its purpose and was not prematurely published, that the DEIS was not improperly segmented or sequenced, and that revision or supplementation of the DEIS was unnecessary.

## B.

New River also contends that neither the DEIS or FEIS adequately considered alternatives to the proposed route for the pipeline extension. NEPA requires that "all agencies of the Federal government shall" include in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on not only the environmental impacts of a proposed action, but also alternatives to the proposed action. 42 U.S.C. § 4332(c). The agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(e). The Commission satisfied these requirements.

Both the DEIS and FEIS evaluated the no-action or postponed-action alternative, system alternatives, major route alternatives, route variations, interconnection site alternatives, and aboveground-facility-site alternatives. Each included considerable detail on the major route alternatives, and why they were not recommended. The FEIS considered 13

major route alternatives in detail, but did not recommend any of them after extensive analysis and multiple site visits. This was sufficient to meet the Commission's obligations to give adequate consideration to appropriate alternative routes. *See Vermont Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 551 (1978). But, New River objects that the DEIS failed to include any analysis of the initial route for the Max Meadows Alternative, which it claims would have avoided all impact to the Shot Tower–Fosters Falls section of the New River Trail State Park. The Commission rejected the Max Meadows Alternative, which was mentioned in the NOI but not the DEIS or the FEIS, because it was longer than the proposed route, would cross previously mined areas, and would be located just west of a national monument. The court, however, need not consider whether the Commission adequately analyzed this alternative route because New River has waived this contention by failing to raise it before the Commission on rehearing, and offers no explanation for its reasons for not having done so. *See* 15 U.S.C. § 717r(b).

## C.

New River further contends that the Commission improperly permitted East Tennessee to determine the location of the pipeline extension by the location of the taps, thus limiting consideration of other alternative routes. This contention, however, misconceives the Commission's role and ignores the record.

First, as the Commission explained, it was the prerogative of East Tennessee to determine the project's goals and the means of achieving them. *See Initial Order,* 101 FERC at 61,750; *see also Independence Pipeline Co. et al.,* 91 FERC ¶ 61,102, 61,345 (2000). Under the NGA, the Commission cannot grant a certificate unless the proposed project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). Some of the goals outlined by East Tennessee in its application for a certificate were to bring much-needed natural gas supplies to parts of southwest Virginia for the first time, and to facilitate planned

future development and economic growth in the regions around the pipeline route. The 20 taps were installed, at East Tennessee's expense, with the support of local governments and business groups along the route, which viewed the taps attached to the pipeline as essential to bringing economic development to their region and attracting new business. Consequently, the Commission determined that installation of the underground taps along the pipeline represented a "potential added benefit to the region" and were an appropriate goal for the Project. *Initial Order,* 101 FERC at 61,751.

Second, the record reveals that the general pipeline route was not chosen based solely on the location of the taps. Other considerations included meeting the needs of the seven shippers with whom East Tennessee already had long-term contracts to provide natural gas, meeting growth in the natural gas local distribution market, and meeting the increased demand for natural gas-fired electric generation. *Initial Order,* 101 FERC at 61,751. In the Commission's view, the "high level of subscription for the Patriot Project alone warrants [the Project's] approval." *Id.* at 61,750–51. It noted that three shippers had already entered into service contracts by the time of the *Rehearing Order,* and that approximately 87 percent of the project's total capacity had been subscribed. *Rehearing Order,* 102 FERC at 61,657. The Commission also considered that the need for electric power and natural gas service would continue to increase in the southeastern states, and that sufficient infrastructure needed to be in place so that increased natural gas demand from electric power plants and distribution companies could be served. *Id.*

The record also refutes New River's contention that the location of the taps along the planned pipeline route inappropriately narrowed consideration of alternatives to the route. The Commission considered and analyzed other alternatives, which were rejected not because they did not incorporate the proposed taps, but because, for example, they increased the length of the pipeline or increased the impact on the environment and residential areas or would have moved all or most of the extension to North Carolina. *See Initial Order,* 101

FERC at 61,751, 61,755. The Commission found, moreover, that "none of the major route alternatives are environmentally superior to the route proposed by East Tennessee, even if some of the taps are not served." *Id.* at 61,751. New River's assertions in its brief that there are no current customers and an inadequate supply of natural gas for the taps, do not invalidate the Commission's consideration of the taps. The Commission found that, at that time, there was an excess of "64,000 Dth a day of currently unsubscribed natural gas capacity available for future use" beyond that already subscribed by the existing seven contracting shippers, *Initial Order,* 101 FERC at 61,751 n.22, and that additional capacity could be made available by such means as capacity release or by adding compression, thereby "bringing a degree of gas service to an area that has no gas service." *Rehearing Order,* 102 FERC at 61,658.

This analysis also disposes of New River's contention that the Commission abused its discretion in failing to evaluate the environmental impact of the taps. The Commission determined that because the taps would be part of the underground installation of the pipeline, there were no tap-related environmental impacts to be considered at that point outside of those arising from the construction of the pipeline itself. *See Rehearing Order,* 102 FERC at 61,663. The Commission further reasoned that it could not evaluate any environmental impacts of the taps along the extension route when it did not know how the taps would be used in the future. *See id.*

## D.

Finally, New River contends that the Commission should have considered the environmental impact of the proposed DENA Wythe Power Plant, as well as evidence that the DENA Wythe and Henry County power plants were not viable. Under the NGA, proposed facilities to be used in the transportation of natural gas in interstate commerce are subject to the jurisdiction of the Commission. *See* 15 U.S.C. § 717(b); *Algonquin Gas Transmission Co.,* 59 FERC ¶ 61,-255, 61,933 (1992). New River does not contest that the

Commission has no authority over the permitting, funding, construction, or operation of the DENA Wythe proposed facilities, all of which are regulated by the Commonwealth of Virginia.

To the extent that the Commission is required under NEPA to give some environmental consideration of non-jurisdictional facilities, *see Henry v. FPC,* 513 F.2d 395, 406 (D.C. Cir. 1975), the Commission has adopted the four-factor test of *Algonquin Gas*, 59 FERC at 61,934. Under this test, in order to determine whether there is sufficient federal control over a project to warrant environmental analysis, the Commission considers: (1) whether the regulated activity comprises "merely a link" in a corridor type project; (2) whether there are aspects of the non-jurisdictional facility in the immediate vicinity of the regulated activity that uniquely determine the location and configuration of the regulated activity; (3) the extent to which the entire project will be within the Commission's jurisdiction; and (4) the extent of cumulative federal control and responsibility. *See* 18 C.F.R. § 380.12(c)(2)(ii). The requirement to consider the environmental effects of non-jurisdictional facilities will thus arise only where they are built in conjunction with jurisdictional facilities and are an essential part of a major federal action having a significant effect on the environment. *See id.*

New River contends that but-for the DENA Wythe Power Plant, the pipeline extension would not have been routed to that location. It maintains, and repeats in its reply brief, that because the second factor of the *Algonquin* test is thus satisfied, that "alone is enough to tip the balance in the four-factor test." Reply Br. at 19. It further maintains that several aspects of the power plant would require federal licenses, such as a federal EPA authorization to operate the proposed underground injection cooling water process. However, the Commission's determination that there was insufficient federal control to warrant the Commission's environmental review of the DENA Wythe Power Plant is entitled to deference. *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Consistent with its practice of applying the *Algonquin* test, *see, e.g., Regent Res. Ltd.,* 102 FERC ¶ 61,307, 61,983 (2003); *Tuscarora Gas Transmission Co.,* 99 FERC ¶ 61,044, 61,175 (2002); *Empire State Pipeline,* 61 FERC ¶ 61,091, 61,374 (1992), the Commission weighed a number of relevant, interrelated factors. The Commission reasoned that not only would construction, operation, and location of the plant be regulated by the Commonwealth of Virginia, but the federal government had no financial involvement in the project and no federal lands were at stake. *See Rehearing Order*, 102 FERC at 61,662–63. By contrast with the *Algonquin* test, which calls for balancing of the federal interest against counterbalancing factors, New River's but-for approach would present the opportunity for the Commission to extend its jurisdiction over non-jurisdictional activities simply on the basis that they were connected to a jurisdictional pipeline. Given the limits of the Commission's NGA jurisdiction, New River fails to show that the Commission's approach was arbitrary and capricious or contrary to law. Absent some indication of further federal involvement, the Commission reasonably concluded that the DENA Wythe and Henry County power plants were non-jurisdictional facilities for which it was not required to evaluate their environmental impact or viability.

Accordingly, because New River has not shown that the Commission acted arbitrarily or capriciously or abused its discretion in evaluating the environmental impacts of East Tennessee's application for the Patriot Project, and because New River's challenge to the administrative record on appeal is meritless, *see* Fed. R. App. P. 17(b)(3); FEIS Public Meeting Comments, Appendix M, FERC Docket No. CP01–415–000, at M543–92 (Sept. 23, 2002), we deny the petition for review.