316 F.3d 1002
 PUBLIC CITIZEN; Brotherhood of Teamsters, Auto and Truck Drivers, Local 70; California Labor Federation; California Trucking Association; Environmental Law Foundation; International Brotherhood of Teamsters, Petitioners,
Natural Resources Defense Council; Planning and Conservation League, Petitioners-Intervenors,
v.
DEPARTMENT OF TRANSPORTATION; Federal Motor Carrier Safety Administration; Nicholas R. Walsh, Respondents.
International Brotherhood of Teamsters; Brotherhood of Teamsters, Auto and Truck Drivers, Local 70; California Labor Federation; California Trucking Association; Environmental Law Foundation; Public Citizen, Petitioners,
Natural Resources Defense Council; Planning and Conservation League, Petitioners-Intervenors,
v.
U.S. Department of TRansportation; Federal Motor CArrier Safety Administration; Joseph M. Clapp; Nicholas R. Walsh, Respondents.
 No. 02-70986.
 No. 02-71249.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 8, 2002.
 Filed January 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Patrick J. Coughlin, Randi D. Bandman, and Stanley S. Mallison, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA; William S. Lerach and Patrick W. Daniels, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA; Albert H. Meyerhoff, Milberg Weiss Bershad Hynes & Lerach LLP, Los Angeles, CA; and Charles S. Crandall, San Luis Obispo, CA, for all petitioners.
 Stephen P. Berzon and Jonathan Weissglass, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, for petitioners International Brotherhood of Teamsters, California Labor Federation, and Environmental Law Foundation.
 Patrick J. Szymanski, General Counsel, International Brotherhood of Teamsters, Washington, DC, for petitioner International Brotherhood of Teamsters.
 David Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA, for petitioner Brotherhood of Teamsters, Auto and Truck Drivers, Local 70.
 David Vladeck, Public Citizen, Washington, DC, for petitioner Public Citizen.
 Adriana Quintero Somaini, Natural Resources Defense Council, San Francisco, CA; and Gail Ruderman Feuer, Natural Resources Defense Council, Los Angeles, CA, for petitioners-intervenors Natural Resources Defense Council and Planning and Conservation League.
 Kirk K. Van Tine, General Counsel, Paul M. Geier, Assistant General Counsel, Peter J. Plocki, and David R. Kock, Department of Transportation, Washington, DC; Judith A. Rutledge, Chief Counsel, and Michael J. Falk, Federal Motor Carrier Safety Administration, Washington, DC; Kelly A. Johnson, Acting Assistant Attorney General, Department of Justice, Washington, DC; and Andrew C. Mergen, David C. Shilton, and John L. Smeltzer, Department of Justice, Environment & Natural Resources Division, Washington, DC, for the respondents.
 Bill Lockyer, Attorney General of the State of CA, Richard M. Frank, Chief Assistant Attorney General, Theodora Berger, Senior Assistant Attorney General, Susan L. Durbin and Edward H. Ochoa, Deputy Attorneys General, Sacramento, CA, for amicus curiae the People of the State of California ex rel. Attorney General Bill Lockyer.
 Margaret N. Strand, Bruce R. Parker, and Lindsay B. Meyer, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC; and Beth L. Law, ATA Litigation Center, Inc., for amicus curiae ATA Litigation Center, Inc.
 On Petition for Review of an Order of the Department of Transportation, Federal Motor Carrier Safety Administration. TRAN Nos. FMCSA-98-3297, FMCSA-98-3298, FMCSA-98-3299, FMCSA-01-10886, FMCSA-01-11060.
 Before D.W. NELSON, HAWKINS and WARDLAW, Circuit Judges.
 OPINION
 WARDLAW, Circuit Judge.
 
 
 1
 Petitioners[1] challenge the Department of Transportation's failure to conduct the requisite environmental analyses prior to promulgating three regulations, the combined effect of which will permit Mexico-domiciled motor carriers to operate within the United States beyond the current limited border zones, thus fulfilling the United States' obligations under the North American Free Trade Agreement. Upon completion of a preliminary Environmental Assessment for two of the three regulations, the Department of Transportation decided that there was no need for further environmental analysis. Petitioners claim that the Department of Transportation's failure to prepare an in-depth Environmental Impact Statement for all three regulations violates the National Environmental Policy Act of 1969, and that its further failure to conduct a "conformity determination" to ensure that the regulations do not disrupt applicable State Implementation Plans violates the Clean Air Act. Although we agree with the importance of the United States' compliance with its treaty obligations with its southern neighbor, Mexico, such compliance cannot come at the cost of violating United States law. Because we conclude that the Department of Transportation acted without regard to well-established United States environmental laws, we grant the petitions.
 
 I. LEGAL BACKGROUND
 
 2
 Before proceeding to the regulations at issue, it is useful to examine the legal and regulatory context in which they were promulgated. These regulations can only be considered against the historical backdrop of the National Environmental Policy Act of 1969, Pub.L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. §§ 4321-4370f) ("NEPA"), the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA"), and the North American Free Trade Agreement, Dec. 17, 1992, U.S.-Can.-Mex., 32 I.L.M. 289 (chs.1-9), 32 I.L.M. 605 (chs.10-22) (1993) ("NAFTA").
 
 
 3
 A. National Environmental Policy Act of 1969
 
 
 4
 On January 1, 1970, President Richard Nixon signed NEPA into law. Although various state and federal environmental measures had been in place for decades, this statute marked the first nationwide comprehensive approach to regulating the interaction between Americans and their environment. Prompted by a series of environmental crises in the late 1960s, NEPA's sweeping reach reflected Congress's conviction that "our Nation's present state of knowledge, our established public policies, and our existing governmental institutions are not adequate to deal with the growing environmental problems and crises the Nation faces." S.Rep. No. 91-296, at 4 (1969).
 
 
 5
 Such broad policy creation was also reflected in the statute's first section, containing the congressional declaration of purpose:
 
 
 6
 The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.
 
 
 7
 42 U.S.C. § 4321. To accomplish these ends, Congress imposed extensive procedural requirements on government action affecting the environment. Paramount among these were the requirements that all federal agencies shall, "to the fullest extent possible":
 
 
 8
 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;
 
 
 9
 (B) identify and develop methods and procedures ... which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
 
 
 10
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —
 
 
 11
 (i) the environmental impact of the proposed action,
 
 
 12
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 13
 (iii) alternatives to the proposed action,
 
 
 14
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 15
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 16
 Id. § 4332(2). Congress further directed that, again "to the fullest extent possible," "the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." Id. § 4332(1). This unequivocal command has guided the United States' environmental policy for more than thirty years, and pervades every aspect of government decisionmaking.
 
 B. Clean Air Act
 
 17
 Federal air quality legislation dates back to at least the mid-1950s, and the CAA itself to 1963, Pub.L. No. 88-206, 77 Stat. 393, but it was the substantial amendment in 1970, Pub.L. No. 91-604, 84 Stat. 1713, that gave the Act its modern, far-reaching scope. The Act was amended again to further broaden its reach in 1977, Pub.L. No. 95-95, 91 Stat. 749, and in 1990, Pub.L. No. 101-549, 104 Stat. 2399. Before the 1970 Amendments, there existed no federal air pollution standards, nor mandatory enforcement mechanisms; federal officials could only encourage states to develop air-quality enforcement programs. All this was dramatically altered by the 1970 Amendments, which mandated national air quality standards and deadlines for their attainment. Pub.L. No. 91-604, § 4, 84 Stat. at 1678-89. These amendments also created an innovative federal-state partnership structure whereby states were to develop individual "implementation plans" to attain compliance with federal standards, and the newly created Environmental Protection Agency ("EPA") was charged with evaluating, overseeing, and enforcing state compliance with these plans. Id. The 1970 Amendments specifically addressed for the first time hazardous pollutants and automobile exhausts, bringing these "mobile sources" within the scope of the EPA's authority. Id. §§ 6-9, 84 Stat. at 1690-700.
 
 
 18
 The 1977 Amendments added an important procedural safeguard: they forbade the federal government and its agencies from "engag[ing] in, support[ing] in any way or provid[ing] financial assistance for, licens[ing] or permit[ting], or approv[ing], any activity which does not conform to [an approved state] implementation plan." 42 U.S.C. § 7506(c)(1). The Act defined "conformity" broadly to include a restriction on such things as "increas[ing] the frequency and severity of any existing violation of any standard in any area," or "delay[ing] timely attainment of any standard... in any area." Id. § 7506(c)(1)(B). This prevented the federal government from hindering states' abilities to comply with the Act's requirements. Finally, the 1990 Amendments vastly increased the list of regulated pollutants, as well as the EPA's civil and criminal enforcement capabilities.
 
 C. North American Free Trade Agreement
 
 19
 On December 17, 1992, President William J. Clinton signed NAFTA, establishing a free-trade zone encompassing the United States, Canada, and Mexico. Upon submission to Congress, it was enacted into law as the North American Free Trade Agreement Implementation Act, Pub.L. No. 103-182, 107 Stat.2057 (1993) (codified as amended at 19 U.S.C. §§ 3301-3473) (effective Jan. 1, 1994).
 
 
 20
 NAFTA aimed to "CONTRIBUTE to the harmonious development and expansion of world trade and provide a catalyst to broader international cooperation" while "STRENGTHEN[ING] the development and enforcement of environmental laws and regulations." Id. pmbl., 32 I.L.M. at 297. Indeed, environmental concerns dominated the debate over NAFTA in the United States. President Clinton waited for over a year to submit the agreement to Congress while the parties negotiated a side agreement, the North American Agreement on Environmental Cooperation, Sept. 14, 1993, U.S.-Can.-Mex., 32 I.L.M. 1480. The NAFTA agreement itself explicitly permits member states to adopt or maintain
 
 
 21
 standards-related measures, including any such measure relating to safety, the protection of human, animal or plant life or health, the environment or consumers... includ[ing] those to prohibit the importation of a good of another Party or the provision of a service by a service provider of another Party that fails to comply with the applicable requirements of those measures or to complete the Party's approval procedures.
 
 
 22
 NAFTA art. 904(1), 32 I.L.M. at 387.
 
 
 23
 The treaty as enacted into United States law specifically determined that in the case of a conflict between the treaty and federal law, federal law would prevail. 19 U.S.C. § 3312(a)(1) ("No provision of the Agreement... which is inconsistent with any law of the United States shall have effect."). Congress also made clear that NAFTA cannot be construed "to amend or modify any law of the United States, including any law regarding ... the protection of human, animal, or plant life or health [or] the protection of the environment." Id. § 3312(a)(2).
 
 II. PROCEDURAL HISTORY
 
 24
 Before us are three regulations, all promulgated on March 19, 2002 by the Federal Motor Carrier Safety Administration ("FMCSA"), an agency within the Department of Transportation (collectively "DOT"). These regulations will permit complying Mexico-domiciled trucks to operate in the United States beyond specified border zones. They are: (1) Application by Certain Mexico Domiciled Motor Carriers to Operate Beyond United States Municipalities and Commercial Zones on the United States Mexico Border, 67 Fed. Reg. 12,702 (Mar. 19, 2002) ("Application Rule"); (2) Safety Monitoring System and Compliance Initiative for Mexico Domiciled Motor Carriers Operating in the United States, 67 Fed.Reg. 12,758 (Mar. 19, 2002) ("Safety Rule"); and (3) Certification of Safety Auditors, Safety Investigators, and Safety Inspectors, 67 Fed.Reg. 12,776 (Mar. 19, 2002) ("Certification Rule"). Under current law, such vehicles are allowed only in so-called "border zones"—specially designated areas near the United States—Mexico border. Application Rule, 67 Fed.Reg. at 12,702. The regulations were issued in compliance with a rider to the 2002 Appropriations Act for DOT, which conditioned funding for permitting Mexican truck traffic into the United States on DOT's issuance of appropriate safety and inspection rules. See Department of Transportation and Related Agencies Appropriations Act, 2002, § 350, Pub.L. No. 107-87, 115 Stat. 833, 864 (2001) ("Appropriations Act"). Petitioners assert that DOT failed to examine adequately the environmental consequences of these regulations, as required by NEPA and CAA.
 
 
 25
 Foreign trucks are permitted to enter the United States only if they are authorized to do so. See generally 49 U.S.C. §§ 13501-13541, 13901-13908; 49 C.F.R. § 365.101-.511. DOT is generally required to grant such permission to any carrier that is "willing and able to comply with" certain statutes and regulations. 49 U.S.C. § 13902(a)(1). In 1982, however, Congress enacted the Bus Regulatory Reform Act of 1982, which imposed a two-year moratorium on the entry of motor carriers domiciled in a "contiguous foreign country," Pub.L. No. 97-261, § 6(g), 96 Stat. 1102, 1107-08, such as Mexico. This moratorium was renewable for subsequent two-year intervals by the President "in the national interest." Id., 96 Stat. at 1108. The moratorium remained in place, through a series of presidential orders, until September 19, 1996.[2]
 
 
 26
 Before the last two-year extension expired, the ICC Termination Act of 1995 was signed into law, causing all "existing restrictions on operations of motor carriers... domiciled in any contiguous foreign country ... pursuant to section 6 of the Bus Regulatory Reform Act of 1982" to remain in effect unless and until the President expressly rescinded them for a statutorily acceptable reason, including "obligations of the United States under a trade agreement." 49 U.S.C. § 13902(c).
 
 
 27
 On February 6, 2001, a specially convened treaty arbitral panel determined that the United States' continued refusal to permit the entry of Mexican trucks beyond the restricted border zones violated NAFTA. Thereafter, as recited in the EA prepared by DOT, President George W. Bush "announced his intent to comply [with this ruling] by modifying the moratorium, pursuant to his statutory authority, once FMCSA [was] ready to issue ... regulations governing Mexico-domiciled [trucks] seeking United States operating authority."
 
 
 28
 After the NAFTA arbitral panel issued its opinion, DOT published Notices of Rulemaking for the Application and Safety Rules on May 3, 2001. See 66 Fed.Reg. 22,371 (May 3, 2001) (Application Rule); 66 Fed.Reg. 22,415 (May 3, 2001) (Safety Rule). Meanwhile, in 1999, Congress had enacted the Motor Carrier Safety Improvement Act, mandating that DOT "complete a rulemaking to improve training and provide for the certification of motor carrier safety auditors ... to conduct safety inspection audits and reviews." 49 U.S.C. § 31148(a). The FMCSA was in the process of preparing these rules in 2001.
 
 
 29
 On December 18, 2001, the 2002 DOT Appropriations Act was signed into law. Pub.L. No. 107-87, 115 Stat. at 833. Section 350 of that Act provides:
 
 
 30
 (a) No funds limited or appropriated in this Act may be obligated or expended for the review or processing of an application by a Mexican motor carrier for authority to operate beyond [the border zone] until the Federal Motor Carrier Safety Administration [issues safety and auditor-certification regulations, and conducts safety studies that meet certain specified criteria].
 
 
 31
 ....
 
 
 32
 (c) No vehicles owned or leased by a Mexican motor carrier may be permitted to operate beyond [the border zone] under conditional or permanent operating authority granted by the Federal Motor Carrier Safety Administration until —
 
 
 33
 (1) the Department of Transportation Inspector General conducts a comprehensive review of border operations.... [and]
 
 
 34
 (2) [t]he Secretary of Transportation certifies in writing in a manner addressing the Inspector General's findings ... that the opening of the border does not pose an unacceptable safety risk to the American public.
 
 
 35
 Id. § 350, 115 Stat. at 864-68 (codified at 49 U.S.C. § 13902 note).
 
 
 36
 DOT subsequently modified the Application, Safety, and Certification Rules to comply with the requirements of the Appropriations Act. Recognizing the need to comply with the regulations implementing NEPA, DOT prepared a preliminary Environmental Assessment ("EA") for the Application and Safety Rules, evaluating their likely environmental impact. DOT determined that a full Environmental Impact Statement ("EIS") was not required, concluding that the proposed rules did not "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Thus, it issued a Finding of No Significant Impact ("FONSI") along with the EA on January 16, 2002. DOT did not prepare an EA for the Certification Rule, because it determined that this regulation fell into the categorical exclusions from the EA/EIS requirement in the NEPA regulations. As a result, DOT also did not include the Certification Rule in its FONSI. Nor did DOT prepare a CAA conformity determination for any of the regulations because it determined that certain categorical exceptions to the conformity-determination requirement applied to them.
 
 
 37
 All three regulations were published in the Federal Register as "Interim Final Rules" on March 19, 2002. The Application Rule updates the requirements for Mexican carriers applying to use United States roads, including the applicants' ability to comply with certain United States truck safety regulations. See Application Rule, 67 Fed.Reg. at 12,735-40. Furthermore, the application form requires the carriers to agree to undergo pre-authorization safety audits, provide proof of insurance, and submit to inspection every three months. Id. at 12,715. The Safety Rule extends "provisional" operating authority to Mexican carriers for the first eighteen months they are licensed to enter the United States, subjecting them to intensified inspection during that period. Safety Rule, 67 Fed.Reg. at 12,771-73. Upon successful completion of this initial period, carriers become eligible to receive "permanent" operating authority, under which they remain subject to less intensive monitoring and inspection. See id. The Certification Rule establishes certification procedures for the requisite personnel to conduct safety and compliance inspections. Certification Rule, 67 Fed.Reg. at 12,779.
 
 
 38
 Petitioners filed a timely petition challenging the validity of the Application and Safety Rules on May 2, 2002 (No. 02-70986), and a timely petition challenging the validity of the Certification Rule on May 14, 2002 (No. 02-71249). Both petitions, alleging violations of the procedural requirements of NEPA and the CAA, were brought pursuant to the judicial review provision of the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA"). We have jurisdiction to review the petitions under 28 U.S.C. § 2342(3)(A), which provides for direct review in the court of appeals of certain administrative actions. We consolidated the petitions by an order dated May 22, 2002. On June 14, 2002, we permitted the Natural Resources Defense Council and the Planning and Conservation League to intervene on behalf of Petitioners.
 
 
 39
 The DOT Inspector General filed a report regarding his "comprehensive review of border operations" on June 25, 2002, and the Secretary of Transportation issued his written certification on November 20, 2002. As promised, following DOT's certification of its readiness to issue the regulations, President Bush modified the trucking moratorium (subsequent to oral argument) to permit Mexico-domiciled motor carriers to provide cross-border services.[3] See Memorandum of November 27, 2002, 67 Fed.Reg. 71,795 (2002).[4] The moratorium remains in place now only as to Mexico-domiciled motor carrier services between points in the United States. Id.
 
 III. STANDING
 
 40
 We must first address Petitioners' standing to sue. Even though standing was not an issue in the administrative proceedings, "federal courts are under an independent obligation to examine their own jurisdiction, and standing' is perhaps the most important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (alteration in original). We need only find that one petitioner has standing to allow a case to proceed. See, e.g., Chief Probation Officers v. Shalala, 118 F.3d 1327, 1331 (9th Cir.1997) (White, Justice, by designation) (evaluation of the standing of a second plaintiff is "unnecessary to resolution of the case"); see also Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) ("There are three groups of plaintiffs in this litigation.... Because we find [that one of the groups] has standing, we do not consider the standing of the other plaintiffs."). Thus, at Petitioners' suggestion, we consider only the standing of Public Citizen.
 
 
 41
 We look first to Public Citizen's ability to satisfy the constitutional requirements for standing, then turn to the requirements for organizational and statutory standing under the APA.
 
 
 42
 [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 43
 Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). We address these constitutional minima in turn.
 
 A. Injury in Fact
 
 44
 "To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that `the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" Cantrell v. City of Long Beach, 241 F.3d 674, 679 (9th Cir.2001) (quoting Defenders of Wildlife, 504 U.S. at 573 n. 8, 112 S.Ct. 2130). The "procedures in question" here require federal agencies to perform certain types of environmental analysis before promulgating regulations. Public Citizen has adequately alleged that DOT failed to properly follow these procedures. "In NEPA cases, we have described [the] `concrete interest' test as requiring a `geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." Id. (quoting Douglas County v. Babbitt, 48 F.3d 1495, 1500 n. 5 (9th Cir.1995)). The same inquiry is appropriate in a CAA case, such as this, where a federal agency has allegedly failed to conduct a conformity determination. That is, environmental petitioners must allege that they will suffer harm by virtue of their geographic proximity to the situs of the claimed pollution.
 
 
 45
 Public Citizen describes itself as an organization whose "members include residents who reside along the Mexican border area in the United States and will be negatively affected by increases in emissions" from Mexico-domiciled trucks if they are allowed into this country. This includes "2,567 ... members [who] live in greater Los Angeles, 1,205 [who] live in the San Diego area, ... [and] 1,094 [who] live in the greater Houston area." These are the geographic areas most likely to be affected by increased truck traffic from Mexico.
 
 
 46
 Public Citizen further alleges that its "members[who] live and work in [these] areas ... that will be most affected by increased emissions from Mexico-domiciled trucks ... will be exposed to such emissions, and as a result may suffer adverse health effects." An individual member of Public Citizen from Houston[5] has submitted a declaration informing us that he monitors smog levels due to diesel truck traffic via e-mail alerts and that he limits his family's outdoor recreational activity when such alerts occur out of concern for their health.
 
 
 47
 We have held that "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." Hall v. Norton, 266 F.3d 969, 976 (9th Cir.2001); cf. Natural Res. Defense Council v. Southwest Marine, Inc., 236 F.3d 985, 994 (9th Cir.2000) (Plaintiffs alleged sufficient injury in fact when they testified that "they have derived recreational and aesthetic benefit from their use of the [affected area] ..., but that their use has been curtailed because of their concerns about pollution, contaminated fish, and the like."). Cognizable "credible threat[s]" include "`increased traffic, pollution, and noise,'" Hall, 266 F.3d at 976 n. 6 (quoting Soc'y Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 176 (3d Cir.2000)), and "increased auto emissions," id. (citing Sierra Club v. EPA, 129 F.3d 137, 139 (D.C.Cir.1997)). This jurisprudence is consistent with the Supreme Court's rule that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons `for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183, 120 S.Ct. 693 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Accordingly, Public Citizen's allegations and supporting evidence fall squarely within our rule, and satisfy the injury-in-fact requirement.
 
 B. Causation
 
 48
 "Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." Cantrell, 241 F.3d at 682; accord Hall, 266 F.3d at 975 (Petitioners "`seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs,' ... establish standing `without meeting all the normal standards for redressability and immediacy.'" (quoting Defenders of Wildlife, 504 U.S. at 572 & n. 7, 112 S.Ct. 2130)). Unlike in an ordinary causation analysis, a petitioner asserting a procedural injury "need only establish `the reasonable probability of the challenged action's threat to[his] concrete interest.'" Hall, 266 F.3d at 977 (quoting Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir.1998)) (emphasis added) (alteration in original).
 
 
 49
 Both in its briefing and at argument, DOT asserted that Public Citizen had not sufficiently established causation because the challenged regulations would not have permitted cross-border Mexican truck traffic unless the President of the United States lifted the moratorium. The President's November 27, 2002 order modifying the moratorium rendered this assertion moot. Even before the President acted, however, Public Citizen's asserted injury could reasonably be linked to DOT's action. Thus, constitutionally adequate causation existed at the time the petitions were filed. See Arizonans for Official English v. Arizona, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review....").
 
 
 50
 DOT's argument hinged on the fact that the President, an independent actor not before this Court, had the ability to stop Mexican trucks at the border even if DOT's regulations were implemented. See Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1152 (9th Cir.2000) ("[T]he causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties...." (emphasis added)); cf. Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("[T]he injury must ... not [be] the result of the independent action of some third party not before the court.").
 
 
 51
 Thus, two parties had to act before the effect complained of would have come about: the President, who had already indicated his intention to comply with NAFTA by lifting the trucking moratorium, and DOT, which had been obligated by Congress, on penalty of budgetary restrictions, to promulgate safety and inspection regulations governing Mexican trucks. Petitioners and DOT engaged extensively over what would be the appropriate metaphor for such an unusual situation, in which two independent parties had the ability to stop an event from occurring, but both had to take action for the event to occur. Public Citizen suggested that the situation was like a door with two locks, where two independent parties each had to use their keys to open the door, or it would have remained shut. DOT asserted that although it had used its key on one of the locks, the President had the more critical key because its use was entirely within his discretion, and not dependent upon a temporary appropriations rider.
 
 
 52
 These metaphorical approaches did not help to clarify the situation. The existence of constitutionally sufficient causation does not hinge on keys, doors, or locks. We do not adjudicate imagined hypotheticals or magical metaphors — we must decide the case presented to us. The only relevant question is whether there was a "reasonable probability" that DOT's promulgation of the regulations would result in increased pollution and adverse health effects to Public Citizen and its members.
 
 
 53
 Even before the recent presidential action, we would have had to conclude that it was reasonably likely that after these regulations became effective, the President would lift the moratorium. "[W]hen standing hinges on choices made by a third party, [a] plaintiff must `adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressibility of injury.'" Yesler Terrace Cmty. Council v. Cisneros, 37 F.3d 442, 447 (9th Cir.1994) (quoting Defenders of Wildlife, 504 U.S. at 562, 112 S.Ct. 2130). Public Citizen pointed to the introductory text of the regulations, in which DOT stated that it was issuing the regulations "in anticipation of a presidential order lifting the current statutory moratorium on authorizing such operations." Application Rule, 67 Fed.Reg. at 12,702. Public Citizen also pointed to the finding of the NAFTA arbitral panel that the United States' consistent refusal to allow entry to Mexican trucks violated the treaty, and the President's consequent announced intent to modify the moratorium once the regulations were issued.
 
 
 54
 The argument the other way, however, had some force. "[I]t usually is difficult to establish causation and redressibility when a plaintiff's alleged injury depends on the actions of a third party not before the court." Yesler Terrace, 37 F.3d at 446. The Supreme Court tells us that an acceptable causation analysis cannot rely on "the independent action of some third party not before the court." Bennett, 520 U.S. at 167, 117 S.Ct. 1154. Certainly the President is an independent actor. Nevertheless, we find dispositive the lower threshold for causation in procedural injury cases, which often involve third parties whose independent actions are necessary for constitutional injury to occur.
 
 
 55
 For instance, to use the Supreme Court's example, a person
 
 
 56
 living adjacent to the site for a proposed construction of a federally licensed dam has standing to challenge mental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years,
 
 
 57
 Defenders of Wildlife, 504 U.S. at 572 n. 7, 112 S.Ct. 2130, and, perhaps more importantly, even though there can be no certainty that the company will ever build the dam even were the license granted. Certainly the fact that the dam construction company applied for a license is an indication that it wishes to build the dam, but a myriad of circumstances—financial, political, or meteorological—could intervene to prevent it from actually following through with its plans. Nevertheless, the Supreme Court considers such a case to contain the requisite level of causation, because it is a procedural injury case, requiring only a "reasonable probability" of causation.
 
 
 58
 Here, the President of the United States had committed himself to a course of action to which the United States was obligated under an important international treaty, passage of which was hard-fought and not without controversy, and as to which it was then in default. There were, of course, a number of developments that could have changed the President's mind on this issue—political, diplomatic, military, or economic—but that cannot detract from his announced intent to comply with the treaty (at least as far as this standing analysis is concerned). President Bush's public statement that he would lift the moratorium is sufficient for these purposes. Thus, it is no metaphysical exercise to conclude that it was reasonably probable, even before the action actually occurred, that the President would rescind the moratorium.
 
 
 59
 We must next look at the likelihood of harm to Public Citizen if it does not prevail in this action. If Public Citizen's petition is denied, then there is nothing to keep the regulations from going into effect. Once this occurs, Mexico-domiciled truck companies will apply for licenses to operate in the United States beyond the border zone, Application Rule, 67 Fed.Reg. at 12,714 (creating 49 C.F.R. § 365.503), and DOT will issue permits to those companies that satisfy the requirements of the challenged regulations, id. at 12,715 (creating 49 C.F.R. § 365.507). Those companies will then begin to operate their trucks in the United States, emitting pollutants that contaminate the air Public Citizen's members breathe and that could potentially cause them myriad adverse health effects. Although DOT and Public Citizen dispute the number of Mexican trucks that will in fact be granted entry, and the quantity of consequent pollutant emissions, both agree that at least some Mexico-domiciled trucks will enter the United States if the regulations are put into effect, and at least some pollutants will be emitted. This is a sufficient causal link between DOT's acts and Public Citizen's alleged injury.
 
 C. Redressability
 
 60
 The third prong of the constitutional standing inquiry requires us to determine whether we possess the ability to remedy the harm that a petitioner alleges. In most procedural injury cases involving environmental analysis, a petitioner "who asserts inadequacy of a government agency's environmental studies ... need not show that further analysis by the government would result in a different conclusion. It suffices that ... the [agency's] decision could be influenced by the environmental considerations that [the relevant statute] requires an agency to study." Hall, 266 F.3d at 977 (emphasis added). Thus, Public Citizen bears a relatively easy burden. If DOT conducted the type of environmental analysis that Public Citizen suggests, its decision could be influenced. Indeed, DOT is required by statute to "insure that... environmental amenities and values... be given appropriate consideration in [administrative] decisionmaking." 42 U.S.C. § 4332(2)(B).
 
 
 61
 As the case now stands, if we grant Public Citizen's petitions, no Mexico-domiciled trucks will be permitted into the United States beyond the border zones until DOT conducts the required analyses; and if we deny the petitions, Mexico-domiciled trucks will be permitted into the United States as soon as they complete the registration and certification process provided in the challenged regulations. Thus, the case presents the very paradigm of constitutional redressability: Public Citizen will suffer harm if we deny its petitions, but the harm will be avoided entirely if we grant the petitions.
 
 D. Organizational Standing
 
 62
 A further necessary standing inquiry is whether Public Citizen is entitled to bring suit on behalf of its members. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw, 528 U.S. at 181, 120 S.Ct. 693 (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). We conclude that Public Citizen has organizational standing. It has adequately alleged injury to its members. The interests at stake—potential adverse health consequences due to increased pollution from diesel truck exhaust—are pertinent to the interests of environmental organizations and other organizations concerned with the physical well-being of their membership. Finally, there is no indication that resolving this case would require, or even be assisted by the participation of individual members of Public Citizen.
 
 E. Statutory Standing Under the APA
 
 63
 In addition to constitutional standing, a petitioner who:
 
 
 64
 brings a statutory enforcement action under the [APA] must meet its statutory requirements for standing. [A petitioner] must establish (1) that there has been final agency action adversely affecting[it], and (2) that, as a result, it suffers legal wrong or that its injury falls within the "zone of interests" of the statutory provision the [petitioner] claims was violated.
 
 
 65
 Churchill County, 150 F.3d at 1078 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882-83, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (internal citations omitted), as amended, 158 F.3d 491 (9th Cir.1998). Public Citizen satisfies the first requirement. Though the regulations at issue are styled as "Interim Final Rule[s]," see, e.g., Application Rule, 67 Fed.Reg. at 12,702, the term "interim" refers "only to the Rule's intended duration—not its tentative nature," Career Coll. Ass'n v. Riley, 74 F.3d 1265, 1268-69 (D.C.Cir.1996) ("Any other construction would suggest that the... publication [of the rule] was without legal significance at all (a senseless repetition of the notice of proposed rulemaking).").
 
 
 66
 As for the second prong, we have held that the APA "require[s] that the `interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1158 (9th Cir.1998) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). As might be expected, "`NEPA's purpose is to protect the environment, not the economic interests of those adversely affected by agency decisions.'" Id. (quoting W. Radio Servs. Co. v. Espy, 79 F.3d 896, 902-03 (9th Cir.1996)). Here, Public Citizen is attempting to protect the environment. Indeed, many of the Petitioners and Petitioners-Intervenors in this case are environmental organizations, or general public interest organizations like Public Citizen that "fight[] for a broad range of public interest issues[,][m]any of [which] relate directly or indirectly to environmental concerns." DOT claims that some of the other Petitioners, labor and trucking organizations — whose standing is irrelevant in any instance — are alleging impermissible economic injuries, but this does not eliminate standing as long as they also assert economic/ health concerns. See id. at 1158-59.
 
 
 67
 * * *
 
 
 68
 In response to our post-argument request for briefing on the significance of the President's modification of the moratorium, DOT makes two additional arguments, neither of which has merit. It first suggests that were we to grant Public Citizen the relief it seeks, that would be tantamount to enjoining Presidential action. We disagree. The President of the United States is not a party to this action, and the issues before us do not touch on his clear, unreviewable discretionary authority to modify the moratorium pursuant to 49 U.S.C. § 13902(c). We similarly reject DOT's assertion that the relief Public Citizen seeks will somehow affect NAFTA's viability. Again, neither the validity of nor the United States' compliance with NAFTA is before us. Our task here is relatively narrow: we are asked only to review the adequacy of the environmental analyses conducted by DOT before promulgating the three regulations.
 
 
 69
 Thus, we conclude that Public Citizen has standing to bring these petitions.
 
 IV. STANDARD OF REVIEW
 
 70
 Review of agency action to determine its conformity with NEPA and the CAA provisions at issue is governed by the judicial review provisions of the APA, 5 U.S.C. §§ 701-706. See Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1176-77 (9th Cir.2000) (NEPA); City of Olmsted Falls v. FAA, 292 F.3d 261, 269 (D.C.Cir.2002) (CAA); see also City of S. Pasadena v. Slater, 56 F.Supp.2d 1106, 1134-35 (C.D.Cal.1999) (CAA review uses same standard as NEPA review). The reviewing court must determine that agency actions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In considering whether an agency acted in an arbitrary and capricious manner, a court "must determine whether the agency articulated a rational connection between the facts found and the choice made." Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife, 273 F.3d 1229, 1236 (9th Cir.2001). Furthermore, courts must "carefully review the record to `ensure that agency decisions are founded on a reasoned evaluation of the relevant factors,'" id. (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)), and may not "`rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute,'" id. (quoting NLRB v. Brown, 380 U.S. 278, 291-92, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)) (omission in original).
 
 
 71
 In the context of the procedural environmental requirements imposed by NEPA and CAA, "[t]he arbitrary and capricious standard requires a court to ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." Wetlands Action Network v. United States Army Corps of Eng'rs, 222 F.3d 1105, 1114 (9th Cir.2000) (internal quotation marks omitted), cert. denied, ___ U.S. ___, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001). A reviewing court is not permitted to substitute its judgment for that of the agency, but rather must "`simply ... ensure that[the agency] has adequately considered and disclosed the environmental impact of its actions.'" Am. Rivers v. FERC, 201 F.3d 1186, 1194-95 (9th Cir.1999) (quoting Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir.1997)). This means that we "must defer to an agency's decision that is fully informed and well-considered," Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir.1998) (internal quotation marks omitted), but "need not forgive a `clear error of judgment,'" id. (citing Marsh, 490 U.S. at 378, 109 S.Ct. 1851), or credit "conclusions that do not have a basis in fact," Ariz. Cattle, 273 F.3d at 1236.
 
 V. ENVIRONMENTAL ANALYSIS UNDER NEPA
 A. DOT's Decision Not to Prepare an EIS
 
 72
 We next determine whether DOT acted in an arbitrary and capricious manner when it failed to prepare an Environmental Impact Statement on the basis of its Environmental Assessment. By its own terms, NEPA intended to reorganize the priorities of the federal government, to integrate "environmental amenities and values" alongside more traditional "economic and technical considerations." 42 U.S.C. § 4332(2)(B). Congress directed that the statute and its implementing regulations be used toward this end in government decisionmaking "to the fullest extent possible." Id. § 4332.
 
 
 73
 To achieve its goal of including environmental concerns in government decisionmaking, NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the ... human environment." Id. § 4332(2)(C). In certain circumstances, agencies may first prepare an EA to make a preliminary determination whether the proposed action will have a significant environmental effect. See Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir.2001) (citing 40 C.F.R. § 1501.4), cert. denied, 534 U.S. 1104, 122 S.Ct. 903, 151 L.Ed.2d 872 (2002). "If the EA establishes that the agency's action `may have a significant effect upon the ... environment, an EIS must be prepared.'" Id. (quoting Found. for N. Am. Wild Sheep v. United States Dep't of Agric., 681 F.2d 1172, 1178 (9th Cir.1982)) (emphasis and alteration in original). "If not, the agency must issue a Finding of No Significant Impact (FONSI), accompanied by `a convincing statement of reasons to explain why a project's impacts are insignificant.'" Id. (quoting Blue Mountains, 161 F.3d at 1212) (internal citations and quotation marks omitted).
 
 
 74
 Thus, to decide whether an EIS is required, we must determine: (1) whether the challenged rules constitute "major" federal actions; and (2) whether they may significantly affect the environment. We find that DOT's rules are major federal actions that may significantly affect the environment, and thus we hold that DOT acted in an arbitrary and capricious manner in failing to prepare an EIS for the challenged regulations.
 
 
 75
 1. "Major Federal Action"
 
 
 76
 The Council on Environmental Quality ("CEQ"), a body established by NEPA, 42 U.S.C. §§ 4342-4347, has issued regulations implementing NEPA. We rely on these regulations to "guide our review of an agency's compliance with NEPA," Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 n. 1 (9th Cir.2002), and the Supreme Court has held that they are entitled to substantial deference, Marsh, 490 U.S. at 372, 109 S.Ct. 1851. The relevant CEQ regulations implementing NEPA define "major Federal action[s]" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility," including "[a]doption of official policy, such as rules, regulations, and interpretations." 40 C.F.R. § 1508.18. DOT, of course, does not dispute that its actions are "federal," but does dispute Petitioners' allegations regarding the regulations' "effects." DOT alleges that the effects of the Application and Safety Rules are limited to the increased diesel emissions of Mexican trucks during the road-side inspections and safety monitoring mandated by the regulations. It thus predicts that there will be no increase in Mexican truck traffic resulting from the regulations. DOT's analysis goes on to suggest that even if such an increase might occur, its effects would not require consideration because it would be a result of presidential rescission of the moratorium, not the regulations themselves. This novel parsing of the regulations' effects fails to meet NEPA standards.
 
 
 77
 DOT's argument here echoes its earlier causation argument in the standing context. It is equally unavailing here for a similar reason. The CEQ regulations make clear that the "effects" of federal actions include "[i]ndirect effects, which are caused by the action and are later in time ... but are still reasonably foreseeable," id. § 1508.8(b), as well as "[c]umulative impact ... which results from the incremental impact of the action when added to other ... reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions," id. § 1508.7.
 
 
 78
 We have already concluded that the President's rescission of the moratorium was "reasonably foreseeable" at the time the EA was prepared and the decision not to prepare an EIS was made. Cf. Native Ecosystems, 304 F.3d at 896 (holding that a memorandum that "evidences a decision to consider ... seriously" taking certain actions renders those actions "reasonably foreseeable"). To restrict consideration of the regulations' "effects" in the way DOT proposes would contravene not only the plain language of the CEQ regulations, but also the statutory command of NEPA, that environmental effects of government action be considered "to the fullest extent possible." 42 U.S.C. § 4332.
 
 
 79
 As for the requirement that the federal action be "major," the CEQ regulations tell us that "[m]ajor reinforces 734 but does not have a meaning independent of significantly," 40 C.F.R. § 1508.18, meaning that a federal action is "major" whenever it has "significant" environmental effects. See City of Davis v. Coleman, 521 F.2d 661, 673 n. 15 (9th Cir.1975).
 
 
 80
 2. "Significantly Affecting the Human Environment"
 
 
 81
 The CEQ regulations also define the crucial term "significantly," to clarify the situations in which an agency must prepare an EIS:
 
 
 82
 "Significantly" as used in NEPA requires considerations of both context and intensity: (a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.
 
 
 83
 (b) Intensity. This refers to the severity of impact.... The following should be considered in evaluating intensity:
 
 
 84
 ....
 
 
 85
 (2) The degree to which the proposed action affects public health or safety.
 
 
 86
 ....
 
 
 87
 (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
 
 
 88
 (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
 
 
 89
 ....
 
 
 90
 (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.
 
 
 91
 40 C.F.R. § 1508.27. If DOT's action is environmentally "significant" according to any of these criteria, then DOT erred in failing to prepare an EIS. See Nat'l Parks, 241 F.3d at 731. An examination of these criteria reveal that the challenged regulations are environmentally "significant," and an EIS should have been prepared.
 
 
 92
 (a) Context
 
 
 93
 The CEQ regulations explain that the proposed federal action must be analyzed with regard to several contexts — national, regional, and local — as well as by looking at the short- and long-term effects of the proposed action. Measured against this standard, DOT's EA is woefully inadequate. The EA calculates likely emissions increases if the Application and Safety Rules are implemented. It dismisses those increases as insignificant, however, because they are "very small relative to national levels of emissions." It does not conduct any analysis regarding whether these increases may be localized in certain areas near the Mexican border, including such likely destinations as Southern California or Texas.
 
 
 94
 Amicus ATA considers it "unreasonable" that DOT should have to "make a determination of the expected routes of 34,000 hypothetical [Mexican trucks]." Regardless of the law's "reasonableness" (a question properly addressed by Congress — not us), this is precisely what NEPA and the CEQ regulations require. The law requires DOT to consider the most likely localities to be affected by increased Mexican truck traffic and to perform more localized analyses for these areas. Indeed, comments submitted to FMCSA during the notice-and-comment period analyzed publicly available government data to predict, not surprisingly, that major cities near the Mexican border would likely suffer the greatest environmental impact as a result of the regulations. The fact that commenters performed such an analysis does not indicate that their analysis was correct, but rather that it was possible to conduct such an analysis. DOT's failure to do so indicates that it did not take a sufficiently "hard look" at the environmental effects of its actions or at the public comments it received.
 
 
 95
 Furthermore, DOT failed to address adequately the long-term effects of its actions. In conducting its EA, DOT limited its analysis to the environmental impact of Mexican trucks in the year 2002. This is anomalous in itself, considering that the regulations were scheduled to become effective only as of May 3, 2002. More significantly, the EA offered no projections of the increase (or decrease) in Mexican truck traffic after 2002, though the regulations were certainly expected to continue in effect beyond the end of last year; indeed they would be in effect now absent this action.
 
 
 96
 ATA contends that increases in Mexican truck traffic in years subsequent to 2002 would be attributable to the "success of NAFTA," rather than to the regulations themselves. This argument is beside the point, as it is impossible to separate increases in truck traffic due to the opening of the border from increases in truck traffic due to successful international trade; it is precisely this desired increase in international trade that prompted DOT to issue regulations facilitating cross-border truck traffic in the first place.
 
 
 97
 Once again, DOT received this very criticism in public comments during its rulemaking process. The commenters used available government data to estimate future increases in Mexican truck traffic after 2002. This alone should have prompted DOT to conduct a long-term analysis, as required by the CEQ regulations, or at the very least, to "convincing[ly] ... explain" its absence. Nat'l Parks, 241 F.3d at 730.
 
 
 98
 (b) Intensity
 
 
 99
 (i) Effect on Public Health and Safety
 
 
 100
 Petitioners contend that DOT must prepare an EIS, in part due to the potential effect of the challenged regulations on public health and safety. Although we have never discussed this requirement in the context of air pollution, other courts have considered "even [the] marginal degradation of drinking water" to be environmentally significant for purposes of this regulation. See United States v. 27.09 Acres of Land, 760 F.Supp. 345, 353 (S.D.N.Y.1991). The same could easily be said of a "marginal degradation" of the quality of the air we breathe.
 
 
 101
 The pollutants at issue are oxides of nitrogen ("NOx") and airborne particulate matter ("PM-10"). These compounds are emitted into the air as part of the exhaust fumes of diesel trucks, such as those that are the subject of the challenged regulations. Petitioners-Intervenors have pointed to a wealth of government and private studies showing that diesel exhaust and its components constitute a major threat to the health of children, contribute to respiratory illnesses such as asthma and bronchitis, and are likely carcinogenic. While these studies were not placed in the administrative record, that does not excuse DOT's failure even to consider whether any negative health effects could be associated with increased diesel exhaust emissions.
 
 
 102
 (ii) Uncertainty
 
 
 103
 If the environmental effects of a proposed agency action are uncertain, the agency must usually prepare an EIS:
 
 
 104
 Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent "speculation on potential ... effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action."
 
 
 105
 Nat'l Parks, 241 F.3d at 732 (quoting Sierra Club v. United States Forest Serv., 843 F.2d 1190, 1195 (9th Cir.1988)) (internal citation omitted) (omission in original).
 
 
 106
 There are a number of areas of uncertainty regarding DOT's EA that merit additional investigation. The most significant of these is whether, and to what extent, cross-border Mexican truck traffic will increase if DOT implements the regulations. A related question is whether, and to what extent, such increased Mexican truck traffic will consist of trucks producing more dangerous emissions than their United States counterparts.
 
 
 107
 DOT acknowledges that "there are reasons to believe that [increased traffic and pollution] might occur," but it contends that these increases will be smaller than Petitioners suggest. Strangely, despite DOT's "reasons to believe" that such increases will occur, its EA does not address them. In fact, the EA specifically assumed for the purposes of its study that "the implementation of [the regulations] would not affect the trade volume between the United States [and] Mexico." It contends instead that any increases "would be the result of the modification of the moratorium and not the implementation of the [regulations]." Indeed, the EA asserts that the number of Mexican trucks in the United States will likely decrease as a result of the new regulations alone, because not all existing Mexican trucks currently operating in the border zone could or will comply with them. This illogical parsing of the cause of increased pollution, i.e., that decreases in truck traffic are credited to DOT's action, but the potentially much larger expected increases in the same traffic are attributed to the President's modification of the moratorium, dictates the EA's overall conclusions.
 
 
 108
 The EA goes on to evaluate the environmental effects of the regulations — attempting to segregate them from those attributable to the rescission of the moratorium — and concludes that the regulations will actually slightly reduce emissions by Mexican trucks within the border zone, and have no significant effect on air quality beyond the border zone, when evaluated on a national scale. This emissions analysis, in turn, is based on the EA's further assumptions regarding the quality and age of the Mexican truck fleet.
 
 
 109
 The EA assumes, without stating any basis therefor, that it "considered" approximately one-third of Mexican trucks to be identical to United States trucks manufactured after 1994, while considering the remaining trucks identical to United States trucks manufactured in 1986. (More precisely, the EA "considered" 130,000 of 400,000 Mexican trucks to be manufactured after 1994, and the rest in 1986, and then lamented the "significant confounding variable" in its study, that the analysis programs it used "were based on United States vehicles.") These years are significant because 1994 is the year after which Mexican emissions standards became equivalent to United States standards. The year 1986 was selected, according to DOT, because it was the last year when neither Mexico nor the United States had any relevant emissions regulations in place.
 
 
 110
 There are two problems with this analysis. First, the EA provides no basis whatsoever for its selection of one-third as the proportion of Mexican trucks manufactured after 1994. Other studies, though not part of the administrative record, have concluded that this percentage is closer to 20% (study by the General Accounting Office) or even 10% (private study commissioned by the California Attorney General). While we do not consider such studies to be conclusive, they are at least founded on some analysis of raw data, and based on some ascertainable methodology. The EA, on the other hand, seems to have randomly selected one-third as its preferred proportion, citing no authority or study for that number.
 
 
 111
 The second analytical defect echoes our concern regarding the EA's failure to consider long-term effects. The United States has already adopted much stricter emissions regulations that will become effective in 2004 and 2007. See 40 C.F.R. § 86.004-11 (2004); id. § 86.007-11 (2007). In addition, six major United States diesel truck engine manufacturers have entered into consent decrees in the District Court for the District of Columbia in settlement of CAA violations, in which they have agreed to abide by certain of the 2004 emissions regulations as of October 1, 2002. See, e.g., Consent Decree, United States v. Caterpillar, Inc., No. 98-02544(HHK) (D.D.C.1999). Neither the EA nor DOT cite to any known plans of the Mexican government to tighten its emissions standards beyond those currently in place. Indeed, the EA never even considered this issue because, as discussed above, it limited its analysis to the year 2002. The existence of regulations and consent decrees that will significantly alter the relative environmental impact of Mexican truck traffic in the near future would further strengthen the need for the EA to have considered future implications of its actions.
 
 
 112
 Thus, the EA — assuming no increase in Mexican truck traffic, making an arbitrary assumption about the percentage of newer, "cleaner" Mexican trucks on the roads, and failing to take account of future increasing discrepancies in emissions rules — conducted an environmental analysis that found no increase in emissions due to the regulations' implementation. Our law mandates that an agency complete an EIS "where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent `speculation on potential ... effects.'" Nat'l Parks, 241 F.3d at 732 (quoting Sierra Club, 843 F.2d at 1195) (internal citation omitted) (omission in original). Petitioners raise many uncertainties about the EA, as does amicus the Attorney General of the State of California, see infra, and there is no suggestion that these uncertainties do not lend themselves to quantification. (Indeed, Petitioners have submitted a number of studies attempting precisely what DOT should have done.)
 
 
 113
 Once again, we do not wish to dictate the outcome of the analysis that DOT must perform. Perhaps DOT will determine that the new regulations will have only a minor impact — one which will be negligible in light of other factors. In the absence of such analysis, however, we cannot defer to the agency's assessment.
 
 
 114
 (iii) Threat of Illegality
 
 
 115
 The California Attorney General asserts that DOT failed to take account of California's emissions regulations, which are "more stringent than the federal standards." In its determination of whether its proposed action is significant, an agency must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10); accord Sierra Club, 843 F.2d at 1195. In Sierra Club, we faulted the Forest Service's EA for its failure to consider, or even mention, California's water quality standards, which might have been threatened by proposed timber sales. See Sierra Club, 843 F.2d at 1195. The same fault is present here. California has mandated the adoption of airborne pollutant standards for the state, Cal. Health & Safety Code § 39606 (West 2002), and has adopted rules setting specific limits for airborne pollutants, including NOx and PM-10, Cal.Code Regs., tit. 17, §§ 70100-200 (2002). Regardless of whether the influx of Mexican trucks will cause the levels of these pollutants to rise beyond California's air quality limits — an issue on which the record before us is insufficient — DOT had an obligation to consider whether its regulations might violate these rules.
 
 
 116
 The California Attorney General also points out that DOT's actions could violate the CAA, thus further triggering the illegality prong of the significance analysis. Because we find that DOT violated the CAA, see infra, this further strengthens our conclusion that DOT's actions are environmentally significant for NEPA purposes.
 
 
 117
 (iv) Controversy
 
 
 118
 "Controversy" sufficient to require preparation of an EIS occurs "when substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action." Nat'l Parks, 241 F.3d at 736 (internal citations omitted and alterations in original). The evidence establishing such a controversy must be brought to the agency's attention while the agency is conducting its deliberations, not post hoc. See id. Thus, the controversy requirement is two-fold: Petitioners must show that there was a "substantial dispute" about DOT's actions and that this dispute raised "substantial questions" about their validity. The burden then shifts to DOT to provide a "convincing" explanation why no controversy exists. See id.
 
 
 119
 Petitioners' claim satisfies the first requirement. We have held that an "`outpouring of public protest'" — where, for example, 85% of public comments opposed the proposed agency action — constitutes a substantial dispute. Id. (quoting Greenpeace Action v. Franklin, 14 F.3d 1324, 1334 (9th Cir.1992)). Here, "[o]ver 90 percent of the comments opposed" DOT's regulations. Application Rule, 67 Fed.Reg. at 12,704. DOT timely received these comments, and duly noted their existence in the comments accompanying the final regulations. See id.
 
 
 120
 Petitioners' claim also satisfies the second requirement. A substantial portion of the negative comments offered real criticism of DOT's action and its failure to adequately assess its 743 environmental impact. These comments, several of which were made by the future litigants here, as well as by other national environmental organizations, describe many of the defects discussed above. Because many of these criticisms have merit, and DOT failed to adequately account for its failure to act on them, its action is "controversial" under the CEQ regulations and requires preparation of an EIS.
 
 
 121
 (c) Convincing Statement of Reasons
 
 
 122
 In sum, Petitioners have successfully demonstrated that DOT's proposed regulations may have a "significant" environmental impact, mandating the preparation of an EIS. DOT has failed to demonstrate that its EA contains anything close to the statutorily required "convincing statement of reasons" sufficient to support a decision not to prepare an EIS. We are similarly unpersuaded by DOT's last-ditch argument that, as an agency with no jurisdiction over environmental matters, it need not consider the environmental consequences of its actions. This argument flies in the face of the text of NEPA, which requires that "all agencies of the Federal Government shall .... include in every... major Federal action[] significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action." 42 U.S.C. § 4332(2) (emphasis added).
 
 
 123
 One final point regarding the shortcomings of DOT's EA is that its analysis is limited to comparing the status quo (the "Baseline Scenario") to the situation in which the regulations had been implemented (the "Proposed-Action Scenario"). By not considering additional alternatives (such as, for example, proposing more stringent controls on incoming Mexican trucks), DOT further failed to abide by NEPA's statutory command to prepare a "detailed statement ... on ... alternatives to the proposed action." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1508.25(b)(2) (defining "[a]lternatives" to include "[o]ther reasonable courses of actions [sic]"). Indeed, the CEQ regulations state that consideration of alternatives "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. "The rule of reason guides `both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative.'" Am. Rivers, 201 F.3d at 1200 (quoting City of Carmel-by-the Sea v. United States Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir.1997)). "`[F]or alternatives which were eliminated from detailed study, [an agency must] briefly discuss the reasons for their having been eliminated.'" Id. (quoting 40 C.F.R. § 1502.14(a)) (emphasis omitted). Thus, in preparing its EIS, DOT should explore a wider range of alternatives.
 
 
 124
 B. Categorical Exclusion of the Certification Rule
 
 
 125
 We next must determine whether DOT acted arbitrarily and capriciously in failing to conduct any NEPA environmental analysis at all for the Certification Rule. DOT contends that this rule falls within an exception to the generally applicable requirements of NEPA. The CEQ regulations allow categorical exclusion of actions "which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4 (citing 40 C.F.R. § 1507.3) (emphasis added). For such actions, "neither an environmental assessment nor an environmental impact statement is required." Id.
 
 
 126
 Agencies are required to develop guidelines as to which of their actions do or do not require the preparation of an EA or an EIS. See id. § 1507.3. FMCSA, as a constituent agency, is subject to DOT's guidelines. See Dep't of Transp., Order 5610.1C, at ¶ 20(a)(2) (Sept. 18, 1979), as amended (July 13, 1982 and July 30, 1985), available at http:/ /isddc.dot.gov [hereinafter "DOT Order 5610.1C"]. Individual agencies within DOT are permitted to issue their own guidelines, id. ¶ 20(a)(1), but FMCSA has not done so.
 
 
 127
 Therefore, we must examine DOT's Order to determine whether the Certification Rule falls within those categories of actions that it has "found to have no[environmental] effect." 40 C.F.R. § 1508.4. Paragraph 4(c) of the order specifies the categorical exclusions DOT employs. See DOT Order 5610.1C, at ¶ 4(c). The list includes such actions as "[a]dministrative procurements," "[p]ersonnel actions," and "[p]roject amendments (e.g. increases in costs) which do not significantly alter the environmental impact of the action." Id. There is no categorical exclusion that seems even plausibly capable of encompassing the Certification Rule.[6] In effect, DOT is arguing that, even though the Certification Rule is not subject to any of DOT's categorical exclusions, it should be categorically excluded from the EA/EIS requirement because it has no significant environmental impact. This cannot be the case.
 
 
 128
 We review an agency's determination that a particular action falls within one of its categorical exclusions under the arbitrary and capricious standard. Alaska Ctr. for Env't v. United States Forest Serv., 189 F.3d 851, 857 (9th Cir.1999); see also California v. Norton, 311 F.3d 1162, 1176 (9th Cir.2002). "[A]n agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." Alaska Ctr., 189 F.3d at 857. DOT has failed to identify any particular categorical exclusion applicable to the Certification Rule and may not do so post hoc. Norton, 311 F.3d at 1175. Even if it could, any claim that one of these exclusions applied would be contrary to the plain text of the DOT Order, and thus "inconsistent with the terms used in the regulation," and not entitled to our deference. Thus, DOT acted in an arbitrary and capricious manner by failing to prepare an EIS, or at least in failing to prepare an EA for the Certification Rule and then determining on that basis whether to prepare an EIS.
 
 VI. CONFORMITY DETERMINATION UNDER THE CAA
 
 129
 Petitioners also contend that DOT acted arbitrarily and capriciously in failing to conduct a conformity determination under the CAA. The CAA requires EPA to establish air quality standards for certain pollutants, 42 U.S.C. § 7409, and it has done so with respect to NOx and PM-10, the pollutants most at issue here, 40 C.F.R. § 50.6, .7, .11. Each state, in turn, is required to adopt and submit for EPA approval a State Implementation Plan ("SIP") for each pollutant. 42 U.S.C. § 7410(a)(1). Each state is divided into "air quality control regions," which are classified as "attainment" or "nonattainment" with respect to each pollutant for which there exists an air quality standard. Id. § 7407. SIPs must contain emissions limitations and other measures designed to bring "nonattainment" regions into attainment. Id. § 7410(a)(2).
 
 
 130
 To ensure compliance with these plans, the CAA contains a "conformity" requirement, mandating that "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." Id. § 7506(c)(1). Most federal actions affecting levels of pollutants in nonattainment regions require that the responsible agency conduct a "conformity determination." 40 C.F.R. § 93.150-.160. However, two categories of federal action are exempted from this requirement: (1) "[a]ctions where the total of direct and indirect emissions are below the emissions level specified in [the regulations]," id. § 93.153(c)(1); and (2) "[a]ctions which would result in no emissions increase or an increase in emissions that is clearly de minimis," including "[r]ulemaking and policy development and issuance," id. § 93.153(c)(2). DOT argues that its regulations fall within both of the above-listed exceptions: that the total emissions caused by the regulations fall below the specified amount, and that the regulations are categorically excluded from the statutory requirements because they are "rulemaking." We review under the arbitrary and capricious standard an agency's decisions regarding SIP conformity determinations, as well as its decisions that certain projects do not require conformity determinations. Olmsted Falls, 292 F.3d at 270.
 
 
 131
 DOT's assessment that its regulations will cause emissions below the amounts specified in 40 C.F.R. § 93.153(b)(1), thus excusing it from making a conformity determination, is based on the predicted emissions in its EA. As we have already determined, however, DOT failed to conduct a reliable environmental analysis. Because of its illusory distinction between the effects of the regulations themselves and the effects of the presidential rescission of the moratorium on Mexican truck entry, DOT systematically underestimated the emissions that would result from its regulations. Furthermore, there were a number of methodological flaws in DOT's EA, including, most relevantly for CAA purposes, the failure to consider its regulations' environmental impact on a local or regional basis.
 
 
 132
 The CAA mandates that each state be divided into "air quality control regions," which are evaluated individually as to their compliance with air quality standards. 42 U.S.C. § 7407. Thus, proper CAA analysis must be conducted at the local and regional levels. The national emissions analysis in DOT's EA is inadequate to comply with the CAA. Because DOT is required to perform a new, more thorough region-by-region environmental analysis to achieve compliance with NEPA, it should also determine, as a result of its new analysis, whether the emissions resulting from its actions will truly fall below the levels established in § 93.153(b)(1). Cf. Olmsted Falls, 292 F.3d at 270-73 (holding that petitioners did not meet their burden of proof on whether a conformity determination was required by simply suggesting that it was an "open question" whether the emissions limits would be exceeded).
 
 
 133
 Second, DOT claims that by listing "[r]ulemaking" as a type of "[a]ction[] which would result in no emissions increase or an increase in emissions that is clearly de minimis," 40 C.F.R. § 93.153(c)(2), the EPA intended to exempt all federal regulations from the requirements of the CAA. Petitioners respond that the exception encompasses only the process of rulemaking itself, but not the agency's implementation and execution of validly promulgated regulations. A careful reading of the EPA regulations, keeping the statutory purpose in mind, dispenses with DOT's erroneous, albeit novel, assertion.
 
 
 134
 The first striking element is that "rulemaking" is listed as a type of "[a]ction[] which would result in no emissions increase or an increase in emissions that is clearly de minimis." Id. If the EPA drafters truly intended to exempt all federal regulations from the conformity determination requirement, they certainly would have been aware that some federal regulations do in fact result in an increase in emissions (or an increase that is not merely de minimis). Indeed, the EPA regulations specify that there are two kinds of emissions, "direct emissions" and "indirect emissions." Id. § 93.152.
 
 Indirect emissions are defined as:
 
 135
 those emissions ... that ... [a]re caused by the Federal action, but may occur later in time ... from the action itself but are still reasonably foreseeable; and ... [t]he Federal agency can practicably control and will maintain control over due to a continuing program responsibility of the Federal agency. Id. "Caused by" was used to refer to "emissions that would not otherwise occur in the absence of the Federal action." Id.
 
 
 136
 Using the but-for analysis suggested by the EPA regulations, a substantial number of federal regulations would result in emissions above de minimis levels. If the EPA had wished to exclude all federal regulations from the scope of this requirement, it easily could have made a bolder statement exempting all federal regulations, regardless of whether they cause direct or indirect emissions.
 
 
 137
 Another clue as to the proper interpretation of the de minimis exception is the fact that the exception is for "rulemaking and policy development and issuance." Id. § 93.153(c)(2)(iii). This juxtaposition strongly suggests that Petitioners are correct in arguing that the "rulemaking" exception should apply only to the process of developing and issuing federal regulations, as opposed to the substantive result produced by the actual implementation of the final rules.
 
 
 138
 Finally, it is relatively easy to imagine federal regulations or "policies" that could have drastic effects on emissions of regulated substances. Even assuming that it is possible the EPA intended these regulations to exclude such actions from the ambit of the CAA's statutory requirements, such a reading would conflict with the basic command of the statute: "No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." 42 U.S.C. § 7506(c)(1). "A federal regulation in conflict with a federal statute is invalid as a matter of law." Watson v. Proctor (In re Watson), 161 F.3d 593, 598 (9th Cir.1998) (citing Chem. Mfrs. Ass'n v. Natural Res. Defense Council, Inc., 470 U.S. 116, 126, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985)) (emphasis in original). Consequently, the Supreme Court has held that an agency's interpretation of a regulation that conflicts with the plain language of the statute is entitled to "no deference." Pub. Employees Ret. Sys. v. Betts, 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). Thus, we read the EPA regulation, to preserve its validity, so that the categorical exception encompasses only the "development and issuance" of federal regulations, not the substantive results of their promulgation and implementation.
 
 
 139
 This conclusion does not conflict with Environmental Defense Fund, Inc. v. EPA, 82 F.3d 451 (D.C.Cir.) (per curiam), as amended, 92 F.3d 1209 (D.C.Cir.1996). In Environmental Defense Fund, the D.C. Circuit examined the validity of EPA regulations nearly identical to those here,[7] and specifically concluded that the "de minimis" exceptions were "an appropriate exercise of the EPA's authority, inherent in the statutory scheme." Id. at 467. In examining the regulations, the court considered the conclusion "that the categorical exemptions are de minimis [to be] entirely self-evident; the EPA has concluded that these activities `would result in no emissions increase or an increase in emissions that is clearly de minimis,' and we neither see nor would expect to find any evidence to the contrary." Id. (quoting 40 C.F.R. § 51.853(c)(2)). Had the D.C. Circuit been reading the EPA regulations in the manner DOT suggests, it certainly "would expect to find" at least some evidence tending to contradict such a premise. Though it did not discuss the "rulemaking" exception specifically, the D.C. Circuit suggests that it would have invalidated the EPA regulation as conflicting with the CAA had the language or context suggested such a broad reading of the regulation. Thus, we decline DOT's suggestion to read the EPA regulation in a way that would tend to under-mine its validity.
 
 VII. CONCLUSION
 
 140
 We have jurisdiction over the petitions for review. We emphasize that we draw no conclusions about the actions of the President of the United States nor the validity of NAFTA, neither of which is before us. The only question before us is whether a federal agency failed to comply with our nation's long-established environmental laws. We hold that the Department of Transportation acted arbitrarily and capriciously in failing to prepare a full Environmental Impact Statement under the National Environmental Protection Act, as well as a conformity determination under the Clean Air Act. Therefore, we grant the petitions, and remand this matter to the Department of Transportation so that it may prepare a full Environmental Impact Statement and Clean Air Act conformity determination for all three regulations.
 
 
 141
 GRANTED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The petitioners in this case are Public Citizen; the Brotherhood of Teamsters, Auto and Truck Drivers, Local 70; the California Labor Federation; the California Trucking Association; the Environmental Law Foundation; and the International Brotherhood of Teamsters. We will refer to them (as well as the Petitioners Intervenors, discussed below) collectively, as "Petitioners" unless otherwise noted
 
 
 [2]
 See 60 Fed.Reg. 12,393 (Mar. 2, 1995); 57 Fed.Reg. 44,647 (Sept. 25, 1992); 55 Fed. Reg. 38,657 (Sept. 17, 1990); 53 Fed.Reg. 36,430 (Sept. 15, 1988); 51 Fed.Reg. 34,079 (Sept. 23, 1986); and 49 Fed.Reg. 35,001 (Aug. 30, 1984).
 
 
 [3]
 We ordered the parties to submit supplemental briefing addressing the effect of the President's order modifying the Mexican-domiciled motor carrier moratorium on the issues presented in this case. Simultaneous supplemental briefs were filed on December 13, 2002
 
 
 [4]
 President Bush had previously modified the moratorium, in a manner not affecting this case, by permitting United States-domiciled Mexican-owned or -controlled motor carriers to provide services within the United StatesSee Memorandum, 66 Fed.Reg. 30,799 (2001).
 
 
 [5]
 We note that, according to the U.S. Geological Survey's National Biological Information Infrastructure, Houston has surpassed Los Angeles as the most air-polluted city in the United StatesSee http://cswgcin.nbii.gov/ urban/urban.html.
 
 
 [6]
 The "categorical exclusions" paragraph of DOT Order 5610.1C reads as follows:
 c. Categorical Exclusions. The following actions are not
 Federal actions with a significant impact on the environment, and do not require either an environmental assessment or an environmental impact statement:
 (1) Administrative procurements (e.g. general supplies) and contracts for personal services;
 (2) Personnel actions (e.g.promotions, hirings);
 (3) Project amendments (e.g. increases in costs) which do not significantly alter the environmental impact of the action;
 (4) Operating or maintenance subsidies when the subsidy will not result in a change in the effect on the environment; and
 (5) Other actions identified by [individual] administrations as categorical exclusions pursuant to paragraph 20.
 (6) The following actions relating to economic regulation of airlines ....
 DOT Order 5610.1C, at ¶ 4(c). As noted above, FMCSA has not promulgated its own supplemental rules pursuant to ¶ 4(c)(5).
 
 
 [7]
 TheEnvironmental Defense decision analyzed 40 C.F.R. § 51.850-.860, which concerned CAA conformity determinations of SIPs with DOT programs under Title 23 of the United States Code or the Urban Mass Transportation Act, 49 U.S.C. §§ 5301-5338, neither of which are implicated in this case.